ARTHUR A. AMARAL AND LUCETTE M. AMARAL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9947-85.          Filed April 26, 1988.

*Matt E. Eqqer, Richard H. Gordin, Bruce S. Lane, and Jack M. Feder,* for the petitioners.

*Kristine A. Roth,* for the respondent.

## OPINION

RUWE, *Judge*:* Respondent determined deficiencies in petitioners' 1980 and 1981 Federal income taxes in the amounts of $24,180.06 and $18,976.10, respectively. The sole issue for decision is whether the salary and emoluments paid to petitioner,[1] Arthur Amaral, by the North Atlantic Treaty Organization in consideration for the performance of services are exempt from taxation by the United States.

The facts have been fully stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

The issue in this case arises out of various international agreements relating to petitioner's employment with the North Atlantic Treaty Organization (NATO or organization).

Petitioners were residents of Belgium when they filed their petition.

## NATO

NATO is an organization of sovereign States that was created by the North Atlantic Treaty (treaty), 63 Stat. pt. 2, 2241, T.I.A.S. 1964, 34 U.N.T.S. 243. The treaty was signed in Washington, D.C., on April 4, 1949, and came into force on August 24, 1949, after ratification by all signatory States.[2]

---

*By order of the Chief Judge, this case was reassigned to Judge Robert P. Ruwe for disposition.

[1] All further references to petitioner are to Arthur Amaral.

[2] The treaty was originally signed and ratified by Belgium, Canada, Denmark, France, Iceland, Italy, Luxembourg, the Netherlands, Norway, Portugal, the United Kingdom, and the United States. Since then, other countries have acceded to the treaty.

Article 9 of the treaty created the North Atlantic Council (Council). The Council is the highest decision-making body in NATO and is composed of permanent representatives appointed by each of the member States (member States). The Council created various committees which are supported by an international staff drawn from all member countries.

To define the status of NATO civilian and military personnel and the status of NATO with respect to the laws of the country in which the Council or its subsidiary bodies met, member States entered into three principal agreements on status, including the agreement on the status of the North Atlantic Treaty Organization, National Representatives and International Staff, 5 U.S.T. 1087, T.I.A.S. 2992, signed in Ottawa, Canada, on September 20, 1951 (Ottawa agreement).[3]

### Ottawa Agreement

One of the purposes of the Ottawa agreement was to extend certain privileges and immunities to members of the international staff and others who provided services to NATO within another member State's territory. The Ottawa agreement was negotiated and drafted by a working group (working group), composed of a representative from each country. Prior to these negotiations, NATO salary scales had been set on the assumption that NATO salaries and emoluments would be free of income tax imposed by any member State. In drafting the tax provisions of the Ottawa agreement, the working group did not want to disturb these agreed salary scales.

Representatives from the U.S. Departments of Treasury, Defense, and Justice met to revise a draft of the Ottawa agreement and produced the first U.S. draft on April 10, 1951. This initial U.S. draft provided, in part:

---

[3]The Ottawa agreement entered into force with respect to the United States on May 18, 1954.

The remaining two principal agreements on status were: Agreement between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, 4 U.S.T. 1792, T.I.A.S. 2846, signed in Washington, D.C., on June 19, 1951; and Protocol on the Status of International Military Headquarters Set Up Pursuant to the North Atlantic Treaty, 5 U.S.T. 870, T.I.A.S. 2978, signed in Paris on Aug. 28, 1952.

Article 12

Persons designated by their Government to serve on the staff of such Government to the Council or subsidiary bodies * * * shall, while exercising their functions, enjoy the following privileges and immunities:

\*     \*     \*     \*     \*     \*     \*

(c) exemption from taxation on their official salary and emoluments and from social security assessments during such period of duty;

\*     \*     \*     \*     \*     \*     \*

Article 14 [previously Article 15]

The provisions of Part V [including article 12 above] shall not require any state to grant any of the privileges or immunities referred to therein to any person who is its national.

This provision, which would have allowed the United States to tax its nationals serving with NATO, was opposed by the representatives of other countries in the working group.

Several competing interests impeded negotiations of the tax provisions of the Ottawa agreement. First, the United States could not accept a scheme which exempted its nationals from U.S. income taxes.[4] Second, a tax on the NATO salaries of nationals by some member States and not others effectively would have lowered the salaries of these nationals relative to tax-exempt salaries. Such an arrangement would have upset the NATO salary scale. Third, the domestic laws or policies of certain member States had to be considered. The United Kingdom wanted to exempt from tax the NATO salaries of its nationals, but could not extend to its nationals, privileges or tax exemptions not extended by other governments to their nationals within the same international organization.

Article 19 of the Ottawa agreement, as finally agreed to, provided as follows:

■ Officials of the Organisation agreed under Article 17 shall be exempt from taxation on the salaries and emoluments paid to them by the Organisation in their capacity as such officials. [2] Any Member State may, however, conclude an arrangement with the Council acting on behalf of the Organisation whereby such Member State will employ and assign to the Organisation all of its nationals (except, if such Member State so

---

[4] A telegram dated Apr. 28, 1951, from the State Department to the U.S. representative on the working group provided, in part:

"Cannot accept principle of [tax immunity to U.S. nationals]. If all other [representatives] insist, U.S. may have to reserve."

desires, any not ordinarily resident within its territory) who are to serve on the international staff of the Organisation and pay the salaries and emoluments of such persons from its own funds at a scale fixed by it. [3] The salaries and emoluments so paid may be taxed by such Member State but shall be exempt from taxation by any other Member State. [4] If such an arrangement is entered into by any Member State and is subsequently modified or terminated, Member States shall no longer be bound under the first sentence of this Article to exempt from taxation the salaries and emoluments paid to their nationals. [5 U.S.T. 1098.]

Article 19 maintained the uniformity of NATO salary scales by providing that officials (as agreed under article 17)[5] who were directly hired by NATO ("direct hires"), would be exempt from tax on their NATO salaries. Member States that wanted to tax the salaries of their nationals could do so by concluding an arrangement with the Council whereby the member State would hire and pay the salary of its nationals at rates which it determined, and then assign or, detail those persons for duty with NATO. Such persons would be "seconded" to NATO. The parenthetical in the second sentence of article 19 was inserted to accommodate Canada, which wanted to maintain tax exemption for nationals not ordinarily resident in Canada, even if Canada entered into a seconding arrangement with NATO.

A portion of an interdepartmental working group report, dated March 17, 1953, prepared by representatives from the U.S. Departments of State, Defense, Treasury, and Justice, explained the purpose and effect of article 19.[6] Generally, and with respect to the last sentence of article 19, this report provided:

NATO "CIVILIAN" AGREEMENT

ARTICLE 19

TAXATION OF OFFICIALS

United States as Sending or Receiving State:

\*　　\*　　\*　　\*　　\*　　\*　　\*

---

[5]Art. 17 provided that the chairman of the council deputies and each member State concerned, would agree on the categories of officials to which arts. 18 through 20 applied. 5 U.S.T. 1096, T.I.A.S. 2992.

[6]This interdepartmental working group report was submitted to the Senate Committee on Foreign Relations together with the Ottawa agreement and two other NATO agreements on status for the committee's consideration for ratification.

Purpose:

This Article provides a technique to safeguard the principle of uniform tax treatment by the United States of all its citizens * * *

    *     *     *     *     *     *     *

If the arrangement between the United States and the Council were to be modified or terminated, such action would result in a release of all Member States from an obligation to accord tax exemption on income received by their nationals from the Organization. The purpose of the last sentence of Article 19 is to assure that once an arrangement of the above sort is entered into it cannot later be altered or terminated in a manner which will give American citizens exemption from United States income taxes.

## London Agreement

An agreement pursuant to the second sentence of article 19 of the Ottawa agreement was entered into between the United States and the Council and was signed in London on September 29, 1951, 5 U.S.T. 1098, T.I.A.S. 2992 (London agreement). The London agreement precluded the direct hire of U.S. citizens by NATO for positions on the international staff. The United States conditioned its signature to the Ottawa agreement upon the prior completion of the London agreement.

The London agreement provided generally (1) that whenever NATO desired the services of a U.S. national, it would notify the deputy U.S. representative to the Council, (2) that the Government of the United States may assign a U.S. national acceptable to NATO to provide such services and that the Government of the United States would provide security clearances for the individual concerned, (3) that the Government of the United States would pay the salaries and emoluments of such person at rates determined by the U.S. Government, (4) that NATO agreed that it would not pay salaries and emoluments to any citizen of the United States, and (5) that the United States would receive a credit against its fiscal year assessment for the salaries and emoluments that would have otherwise been paid to such persons by NATO.

## The Soldow—de Vries Arrangement

In 1967, the U.S. delegation to NATO proposed that the United States permit the direct hire of its nationals by

NATO for middle- and lower-level positions on the international staff. At that time, virtually no U.S. nationals occupied these middle- and lower-level positions, and direct hire by NATO was thought to be the most efficient employment procedure. Negotiations regarding this proposal continued through early 1972.

In a telegram dated January 13, 1972, to the U.S. representatives in London, the U.S. Secretary of State explained that these proposed agreements between the United States and NATO regarding direct hire were intended to modify the London agreement but that under the last sentence of article 19, any modification of the London agreement would release all member States from their obligation to exempt from tax the NATO salaries of their nationals. To avoid this result, the Secretary of State cautioned that:

> In discussions, Mission should characterize exchange as only "Implementation" (Not "Modification") of existing US-NATO Agreements. If pressed on this point, Mission may explain that exchange of letters is based on authority contained in Ottawa Agreement Article XIX, the second sentence of which permits the exclusion of U.S. nationals "not ordinarily resident" from the arrangements concluded under that sentence.

The final agreements regarding direct hire were formalized in an exchange of letters, dated April 13 and April 14, 1972, between W.J. de Vries, Director of Administration and Personnel, NATO, and James J. Soldow, Director, Personnel, Administration and Security, United States Mission to NATO (Soldow—de Vries arrangement). The Soldow—de Vries arrangement affected the London agreement and two other virtually identical agreements[7] between the United States and NATO which governed the employment of U.S. nationals by the several NATO bodies.

In his letter of April 13, 1972, Mr. de Vries described the Soldow—de Vries arrangement as follows:

---

[7] The two other agreements implemented art. 7(2) of the Protocol on the Status of International Military Headquarters Set Up Pursuant to the North Atlantic Treaty, 5 U.S.T. 870, T.I.A.S. 2978. See note 3 *supra.* These agreements were: US-NATO arrangement concerning the employment by International Military Headquarters of US Nationals, concluded Feb. 25, 1953, T.I.A.S. 2978, and US-NATO arrangement concerning the employment by International Military Organizations of US Nationals, concluded Sept. 18, 1963.

Under these agreements [including, among others, the London agreement] in the future, when one of the NATO organizations wishes to employ a US citizen, it may do so and may pay his or her salaries and emoluments directly, provided that the US citizen in question has been present for at least 510 full days within the 18 preceding consecutive months in a country or countries other than the United States. The salaries and emoluments thus paid will be exempt from taxation. Security clearance for such US citizens will be provided by the Government of the United States.

From our discussions, I understand that the Direct Hire procedures will apply only to positions in grades A.3 and L.3 and below, and only for those positions with a salary of $20,000 or less per annum. It is further understood that the new procedures would not prevent the United States Government from continuing in appropriate cases to assign US nationals to positions with NATO organizations in all grades, including grades A.3 and L.3 and below, under existing procedures.

This understanding may be modified by subsequent informal agreement should it appear advantageous to do so.

The purpose of the Soldow—de Vries arrangement was to allow the direct hire of certain U.S. citizens who could meet the requirements for exclusion under section 911.[8] For all relevant years prior to January 1, 1976, section 911 allowed a $20,000 exclusion from gross income for individuals present in a foreign country for at least 510 full days during 18 consecutive months. Section 911 did not apply to amounts paid by the United States or any agency thereof. Sec. 911(a)(2). Therefore, no U.S. citizen who was paid by the United States and seconded to NATO could qualify for the section 911 exclusion.

### Termination of the Soldow—de Vries Arrangement

Section 1011 of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1610, generally would have reduced the section 911 exclusion from $20,000 to $15,000 for years beginning after December 31, 1975, but subsequent legislation deferred the effective date of the 1976 amendment.[9] The Foreign Earned Income Act of 1978, Pub. L. 95-615,

---

[8]All section references are to the Internal Revenue Code of 1954 as amended and as in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise indicated.

[9]The effective date of the 1976 amendment to the foreign earned income exclusion allowed by sec. 911 was first deferred until years beginning after 1976, sec. 302, Tax Reduction and Simplification Act of 1977, Pub. L. 95-30, 91 Stat. 126, 152, and deferred again until years beginning after Dec. 31, 1977, sec. 4(a), Tax Treatment Extension Act of 1977, Pub. L. 95-615, 92 Stat. 3097.

sec. 201 et seq., 92 Stat. 3098, generally replaced the section 911 foreign earned income exclusion for years beginning after December 31, 1977, with a deduction for certain expenses of living abroad. A limited section 911 exclusion remained for employees who resided in hardship camps.[10] For years after December 31, 1981, the foreign earned income exclusion was again reinstated and the amount of the exclusion was increased.[11]

In November 1976, the State Department concluded that the practice of not taxing persons directly hired by NATO, pursuant to the Soldow—de Vries arrangement, conflicted with the 1976 Act which limited the section 911 exclusion to $15,000. The Department of State terminated the Soldow—de Vries arrangement in 1977.

### Petitioner's Employment

Petitioners were bona fide residents of Belgium from 1958 through 1980 and 1981. From February 1958 through September 1972, petitioner was employed by the U.S. Civil Service and seconded to NATO. On September 30, 1972, petitioner was retired through a reduction-in-force action. Subsequent to an initial appointment of 1 year commencing October 1, 1972, petitioner was indefinitely appointed to the international staff of NATO pursuant to an employment contract dated September 20, 1973, between petitioner and the Director General of NATO Integrated Communications System Management Agency. In his position as a direct hire on the international staff, petitioner was an official to whom the provisions of article 19 of the Ottawa agreement applied.

A letter, dated April 4, 1977, to petitioner from the Director, Personnel, Administration and Security, United States Mission to NATO, advised petitioner about the State Department's interpretation of the effect of the Tax Reform Act of 1976 on direct hires. The letter provided in part:

---

[10]Sec. 202, Foreign Earned Income Act of 1978, Pub. L. 95-615, 92 Stat. 3098. In addition, taxpayers were permitted to elect for 1978 to be taxed under the 1978 amendments or under the provisions of the Tax Reform Act of 1976. Sec. 209(c)(1), Foreign Earned Income Act of 1978, Pub. L. 95-615, 92 Stat. 3109.

[11]Sec. 111(a), Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 190.

Dear Mr. Amaral:

The U.S. Department of State has asked me to inform you formally that the Tax Reform Act of 1976 contains Section 1011 which has bearing on the amount of salaries exempt from taxation earned by U.S. citizens abroad (including those directly employed by NATO and its subsidiary bodies).

In effect, nothing in Section 1011 of the 1976 Tax Reform Act exempts salaries paid to U.S. citizens employed by NATO from taxation with respect to income exceeding $15,000 annually. These amounts are not exempt from U.S. tax pursuant to Article 19 of the Ottawa Agreement.

The above information has been communicated to the NATO Director of Administration and Personnel. In the event you are notified that your NATO employment will be terminated due to the tax restrictions imposed, I would appreciate it if you could inform me whether you would be interested in secondment by the United States to the position you now occupy. If that is the case, the Departments of State and Defense will explore the possibility of such secondment. If it is possible, they will provide the information you need in order to make a final decision.

NATO did not terminate the employment of petitioner. From October 1, 1973, and continuing through the taxable years in issue, petitioner was employed with NATO at grade A.3, and during this time, petitioner received his entire salary from NATO.

Petitioner's compensation from NATO was $67,294.30 and $53,417 in 1980 and 1981, respectively. Petitioner did not qualify for the section 911 exclusion during either of these years because he did not reside in a hardship area. Petitioner excluded from gross income on his 1980 and 1981 returns all salaries and emoluments paid by NATO. No U.S. taxes were withheld on this salary. Respondent's position is that all of petitioner's NATO salary is includable in gross income.

The parties have stipulated that the salaries and emoluments received during 1980 and 1981 by all NATO direct hires who were citizens of the United States, were exempt from taxation by the United States under article 19 of the Ottawa agreement unless, (a) such compensation was subject to tax pursuant to the London agreement, or (b) the London agreement was previously modified or terminated within the meaning of the last sentence of article 19. The parties have further stipulated that from the date the London agreement was entered into through the years in issue, the London agreement was neither modified nor

terminated within the meaning of the last sentence of article 19 unless, and to the extent that, the London agreement was modified by a subsequent amendment to section 911. Respondent did not argue on brief that the amendments to section 911 modified the London agreement and in our opinion no viable argument can be made to that effect.[12] Accordingly, petitioner will prevail in this case unless we determine that NATO compensation was subject to tax pursuant to the London agreement.

U.S. citizens are subject to tax by the United States on their worldwide income. Sec. 1.1-1(a), (b), Income Tax Regs. Under section 894, income exempt from tax under any treaty obligation of the United States is excluded from gross income. Under section 7852(d), no provision of the Code applies when it is contrary to any treaty obligation of the United States in effect on the date of the enactment of the 1954 Code, August 16, 1954. The Ottawa agreement and the London agreement, which was annexed to and supplements the Ottawa agreement, were both in effect on August 16, 1954.[13] Accordingly, to the extent petitioner's income is exempt from tax under these agreements, his income will not be subject to tax under any provision of the Code.

We follow several canons to construe the international agreements before us. Treaties are to "be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them." *Jordan v. Tashiro,* 278 U.S. 123, 127 (1928). The words of a treaty are to be interpreted according to their "ordinary meaning 'as understood in the public law of nations.'" *Santovincenzo v. Egan,* 284 U.S. 30, 40 (1931) (quoting *Geofroy v. Riggs,* 133 U.S. 258, 271 (1890)). The plain words of the treaty control unless their effect is contrary to the intent of the signatories to the treaty. *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180 (1982).

---

[12]Congress may terminate or modify a treaty by a later statute, *The Chinese Exclusion Case,* 130 U.S. 581, 600-601 (1889), but we will not deem a treaty to have been so modified or terminated unless we find that Congress has clearly expressed its purpose to do so. *Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 252 (1984). Nowhere in the various amendments affecting the amount excludable under sec. 911, from 1976 through 1981, does Congress express its intent to modify any existing treaty provisions of the United States.

[13]There is no dispute that the Ottawa agreement is a treaty which, together with the annexed London agreement, has the force and effect of law in the United States under U.S. Const. art. VI, cl. 2.

We construe a treaty like a contract. *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. at 253; *Sullivan v. Kidd,* 254 U.S. 433, 439 (1921). "The course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning." *O'Connor v. United States,* 479 U.S. 27, 33 (1986). See also *Trans World Airlines, Inc. v. Franklin Mint Corp., supra* at 259-260.

The parties in this case do not differ as to the meaning of any particular word or phrase of the London agreement or of article 19 of the Ottawa agreement. The parties agree that the signatories to the treaty generally intended: (1) That the first sentence of article 19 was to exempt the salaries of NATO direct hires from tax; (2) that a member State which wanted to tax its nationals could do so by entering into an agreement pursuant to the second sentence of article 19; and (3) that the London agreement was entered into between the United States and NATO pursuant to the second sentence of article 19 to prevent NATO from directly hiring U.S. nationals.

Pursuant to the Soldow—de Vries arrangement in 1972, the State Department and NATO informally agreed to allow the direct hire of U.S. nationals by NATO, which was seemingly contrary to the terms of the London agreement. The Soldow—de Vries arrangement was terminated in 1977. During the tax years at issue, 1980 and 1981, the Soldow—de Vries arrangement was no longer in effect and has no direct bearing on this case. Accordingly, the London agreement and article 19 of the Ottawa agreement are the only international agreements relevant to petitioner's tax liability.

The London agreement provides that the United States, and not NATO, will hire U.S. citizens for positions with NATO and pay their salaries. The London agreement is silent regarding the tax consequences of its hiring procedures. Rather, these tax consequences are controlled by article 19. The third sentence of article 19 provides that a member State may tax amounts which it pays pursuant to a seconding agreement, but under the clear terms of article 19, salaries paid by NATO are not subject to tax unless a seconding agreement has been modified or terminated. The

parties have stipulated that the London agreement was not modified or terminated prior to or during the years at issue (unless, and to the extent that, it was modified by a subsequent amendment to section 911).[14] The clear language of article 19 will control unless it produces an effect which is contrary to the intent of the signatories. *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. at 180.

Respondent's position is that article 19 must be interpreted to provide a tax exemption for NATO salaries only if no seconding agreement has been negotiated, but that once a member State has entered into a seconding agreement it is no longer obligated to exempt NATO salaries from tax. Respondent asserts that, by reason of the London agreement, the United States is free to assert taxing jurisdiction with respect to the NATO salaries of its nationals.

We find no express support for respondent's position in the language of either the London agreement or the Ottawa agreement. Further, to construe the treaty before us we give weight to the State Department's manner of negotiating and enforcing it. *Kolovrat v. Oregon,* 366 U.S. 187, 194 (1961). The State Department continued to treat the first sentence of article 19 as operative with respect to the United States after the London agreement had been entered into. For example, during the negotiations of the Soldow—de Vries arrangement, the State Department recognized that the United States could not tax the NATO salaries of its nationals who were direct hires without conflicting with the first sentence of article 19. The Soldow—de Vries arrangement reflects the State Department's attempt to harmonize U.S. taxing authority with the tax exemption accorded by the first sentence of article 19.[15] Thus, the Soldow—de Vries arrangement allowed direct hiring by NATO only for persons whose entire salary otherwise qualified for exemption under section 911.

Respondent also contends that a purely mechanical interpretation of article 19 produces a result which is contrary to

---

[14]As previously noted, respondent appropriately did not argue that sec. 911 modified the London agreement. Even though there is an argument that the Soldow—de Vries arrangement was a modification of the London agreement, it is apparent that neither the State Department nor the respondent desires that it be viewed as such and we will respect that determination.

[15]We recognize that some legal advisors in the State Department have concluded that sec. 911 supersedes the tax exemption provisions of art. 19. These are conclusions of law for which we find no basis and which we are not required to follow.

the intent of the United States as a signatory to the Ottawa agreement. Respondent asserts that the United States intended to reserve the right to tax all its nationals on their worldwide income. Respondent refers to the negotiating history of the Ottawa agreement and the London agreement during which U.S. representatives consistently rejected proposals which obligated the United States to exempt from tax salaries paid to U.S. nationals.

Respondent asks us, in effect, to interpret article 19 as a saving clause. A saving clause is a provision in which the United States reserves the right "to tax its citizens and residents on the basis of the provisions of the Internal Revenue Code without regard to the provisions of the treaty." *Filler v. Commissioner,* 74 T.C. 406, 410 (1980). See also *Crow v. Commissioner,* 85 T.C. 376, 380-381 (1985). During negotiation of article 19, the United States tried to insert a saving clause into the Ottawa agreement but this provision was rejected by other member States.

We agree that the United States intended that its nationals be subject to its taxing jurisdiction. We find, however, that the United States intended to accomplish this result by complying with the mechanism provided in article 19. Within the interdepartmental working group report, prepared by representatives from the U.S. Departments of State, Defense, Treasury, and Justice regarding the Ottawa agreement and the two other NATO agreements on status, we find support for the position that the United States believed that article 19 gave it a mechanism to tax U.S. nationals rather than an absolute right to tax them:

This Article provides a *technique* to safeguard the principle of uniform tax treatment by the United States of all its citizens * * * [Emphasis supplied.]

The working group which drafted the Ottawa agreement fashioned the mechanism of article 19 after long and careful negotiations. During these negotiations, the working group considered not only the U.S. position on taxation, but also the position of other countries, such as Great Britain, which wanted to exempt its nationals from tax on salaries and emoluments received from NATO, but could only do so if no other country taxed its nationals on such salaries and

emoluments.[16] The working group also considered the importance of retaining a uniform NATO salary scale. The working group may also have considered that a tax on NATO wages by one member State would effectively reduce that member State's contributions to NATO. The design of article 19 addresses these competing interests. We cannot now disregard this carefully crafted design.[17] The United States retains the power to tax its nationals by following the hiring procedures set out in the London agreement.[18]

We are bound to give effect to the clear language of article 19. Accordingly, we find that the salary and emoluments paid to petitioner by NATO are exempt from tax.

*Decision will be entered under Rule 155.*

---

[16]Acceptance of respondent's interpretation of the agreements would seemingly fly in the face of concerns such as those of Great Britain, since it would allow the United States to tax its nationals who were direct hires of NATO.

[17]The chairman of the working group which drafted art. 19 prepared a note, dated July 19, 1951, which was submitted to the working group together with a draft of art. 19 in the form in which that article finally was adopted. The note provided, in part:

"[Art. 19] * * * represents a finely balanced compromise to meet a particularly delicate situation and every word has been most carefully weighed."

[18]Had NATO directly refused a directive to terminate direct hires, it could be argued that this would be a modification or termination within the last sentence of art. 19. As previously noted, the parties have stipulated that there was no modification or termination (except possibly by a subsequent amendment to sec. 911). There is no evidence in the record before us as to whether the State Department ever complained to appropriate NATO authorities about NATO's failure to terminate the employment of U.S. direct hires. In any case, any failure by NATO to comply with State Department directives is a problem that should be resolved by diplomatic means.