CRISTIAN L. AND NICOLA M. JULIARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Juliard v. Commissioner
Docket No. 21777-88
United States Tax Court
T.C. Memo 1991-230; 1991 Tax Ct. Memo LEXIS 259; 61 T.C.M. (CCH) 2683; T.C.M. (RIA) 91230; May 23, 1991, Filed *259 Decision will entered for the respondent without the additions to tax. Charles B. Cocke, for the petitioners. Susan T. Mosley and Mary Gillmarten, for the respondent. WELLS, Judge. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiency in and additions to petitioners' Federal income tax: Additions to Tax Under Section
Year
Deficiency
6653(a)(1)
6661(a)
1984
$ 7,916.00
$ 395.80 *
$ 1,979.00
Unless otherwise indicated, all section references are to the Internal Revenue as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Respondent has conceded the addition to tax under section 6661(a). Therefore, the issues remaining for our consideration are (1) whether petitioners are entitled to exclude from income under *260 section 911 amounts received as compensation from the U.S. Agency for International Development, and (2) whether petitioners are liable for the addition to tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated for trial pursuant to Rule 91. The stipulations and accompanying exhibits are incorporated in this Opinion by reference. During the year in issue and at the time the petition in the instant case was filed, petitioners resided in Port-au-Prince, Haiti. At relevant times petitioner Cristian L. Juliard (hereinafter petitioner) was a U.S. citizen. Petitioner held a bachelor's degree in government, a master's degree from Georgetown University, and a Ph.D in African economics from a French university. After receiving his master's degree, petitioner served in the Peace Corps for 2 years. Petitioner's other professional pursuits included working with business organizations in the Virgin Islands, lecturing at the College of the Virgin Islands on Caribbean and African studies, setting up his own business in the United States, and designing projects related to the Caribbean Basin Economic Recovery Act, Pub. L. 98-67, 97 Stat. 384 (1983). In the early *261 1980's, petitioner became associated with the Partnership for Productivity International (PFP), a consulting firm specializing in business development, in which capacity he designed a small business development project in Barbados. In 1983, PFP assigned petitioner to Haiti to perform work in connection with a contract between PFP and the United States Agency for International Development (USAID). Projects for USAID in Haiti generally involve several steps. The first step in such projects is the "new project description," a one-page description of an idea, which must receive approval from Washington, D.C., before any further work is undertaken. The second step is the "concept paper," which identifies a project in broad terms and is a maximum of 15 pages long. The third step is the "project identification document." The fourth step is the "project paper," which discusses the details of budgeting for the project as well as the administrative and social implications of the project. The fifth step is getting approval of project funding and a grant for the project. Petitioner's work for PFP in Haiti involved writing a "concept paper" for USAID within a 6-month contract period. The *262 concept paper on which petitioner worked for USAID through his association with PFP covered the Haitian need for management training and promotion of investments. After completing the concept paper for PFP, petitioner visited relatives in Portugal. While in Portugal, he was contacted by USAID and asked if he was interested in continuing work on the project for which he had written the concept paper. Petitioner was told that he would be engaged directly by USAID rather than through PFP because an individual contract was preferable to an "institutional" contract from the standpoint of necessary contractual procedures, including Federal procurement regulations. Petitioner also understood that USAID was not required to advertise his position. Petitioner agreed to return to Haiti and was engaged (a neutral term we use in lieu of "employed," a term covering the central issue in the instant case) by USAID to work on the project identification documents and project papers for two projects. The project described in his concept paper had been divided into a separate Management Productivity Center project and Investment Authority project. USAID uses the following three categories to distinguish *263 its personnel: (1) Direct hires, (2) personal services contractors, and (3) nonpersonal services contractors. "Direct hires" do not have written employment contracts, but are employed by appointment for open-ended terms. Personnel in the second and third categories, however, provide services pursuant to written contracts which are of limited duration. Petitioner was engaged as a "personal services contractor." The provisions of 41 C.F.R., chapter 7, appendix F, which governed personal services contracts with USAID during the year in issue (prior to being moved to 48 C.F.R.), defined a "personal services contract" as "one which establishes an employer-employee relationship," and a "nonpersonal services contract" as "one which establishes an independent contractor relationship." Those provisions also stated, under the heading "Policy," that "A personal services contract with an individual may be used when adequate supervision is available and for nearly any type of work." However, certain enumerated functions, including negotiating on behalf of the United States, establishing AID policy, and performance of internal functions such as personnel selection and administration, agency *264 management, and Congressional presentation, could not be performed by personal services contractors. Periodically, the names and job categories of all personnel working for USAID in Haiti were updated in "staffing pattern" documents. A staffing pattern document effective during the year in issue listed petitioner as one of five "employees" working in the Office of Private Enterprise Development, as follows: Name of Employee
Position Title
Classification * * *
Office of Private Enterprise Development
Reese Moyers
Trade Dvl. Off.
USDH
(Vacant)
Asst. Trade Dvl. Off.
USDH
Margareth Kalil Cesar
Secretary
USDH
Melissa Brinkerhoff
Contractor
Project funding
Criss Juliard
Contractor
Project funding
[petitioner]
Muriel V. Hollant
Secretary
Contractor
Mr. Reese Moyers, to whom petitioner reported, was classified by USAID as a "direct hire." The Office of Private Enterprise Development in which petitioner worked was one of 14 USAID offices listed in the staffing pattern. Of the 138 total positions listed in the staffing pattern, approximately 50 percent had either a "position title" or "classification" of "Contractor." The position titles having a classification of "Contractor" *265 included that of mail clerk, receptionist, and Xerox attendant. Petitioner's arrangement with USAID was documented in an original contract (the contract) entered into in January 1984. The cover page of the contract was a form entitled "Agency for International Development Contract With a U.S. Citizen or U.S. Resident for Personal Services Abroad," which contemplated a period of service beginning January 22, 1984, and an estimated completion date of October 19, 1984. In addition to several pages specifically dealing with petitioner's arrangement, the contract included "General Provisions" contained in form AID 1420-37 (the General Provisions). The "schedule" specifically pertaining to petitioner's services was to control if any conflict existed between such schedule and the General Provisions. The contract designated petitioner as the "Contractor" and stated that he was to perform the services described in the "Statement of Work," which is reproduced in the appendix herein. As compensation for his services, the contract provided that USAID would pay petitioner at a rate of $ 209 per day for an estimated 190 working days (for a total of $ 39,710) and that, in the event petitioner *266 worked less than a full 8-hour day, his compensation would be $ 26.13 per hour ($ 209 divided by 8). The General Provisions stated that the Contractor's workweek: shall not be less than 40 hours, unless otherwise provided in the Schedule, and shall coincide with the workweek for those employees of the Mission or the cooperating country agency most closely associated with the work of this Contract.
The General Provisions also detailed the required submission of "vouchers" by petitioner to receive payment under the contract and indicated that a fully executed Form W-4 (Employee's Withholding Allowance Certificate) was to be submitted along with the first voucher. The budget for petitioner's contract was computed based on a 5-day work week and included, in addition to the $ 39,710 described therein as "salary," the following other benefits: an advance of $ 3,000, "Defense Base Act" insurance equal to 2.25 percent of salary, a 15-percent "post differential," allowances for household furniture, shipment costs, costs of housing for 9 months at $ 900/month, storage costs for household effects, transportation costs for two between Philadelphia and Haiti, and miscellaneous items. *267 The General Provisions provided for additional benefits, including workmen's compensation benefits. During the year in issue, USAID paid the "employer's share" of the Social Security tax with respect to petitioner (as called for by the contract) and withheld the "employee's share" of such tax from amounts paid to petitioner. USAID also filed a Form W-2 with the Internal Revenue Service reporting the withholding of both Federal income tax and Social Security tax from petitioner's compensation. Under the heading "Contractor-Mission Relationships," the General Provisions stated that the Mission Director was the chief representative of USAID in the cooperating country and that the Contractor, in addition to being responsible for performing his duties, would be "under the general policy guidance of the Mission Director." The General Provisions also contained rules regarding reports to be prepared under the terms of the contract. Among those rules was a provision instructing the Contractor to refrain from using elaborate art work, multicolor printing, and expensive paper/binding unless specifically authorized, and suggesting that pages be printed on both sides using single-spaced type. *268 Petitioner was subject to rules contained in the General Provisions regarding vacation leave, sick leave, leave without pay, and holidays. Under those rules, vacation leave generally was earned at the rate of 13 workdays per year or 4 hours every 2 weeks, sick leave was earned at a rate not to exceed that rate and could be carried over under a contract extension, leave without pay could be taken only with permission, and holidays were those to which U.S. citizen "direct-hire" employees on comparable assignments were entitled. If petitioner desired to take leave for a period of longer than 3 days, the approval of a supervisor had to be obtained.
The contract also could be terminated by USAID pursuant to the General Provisions "for cause," "for the convenience of AID," or "for the convenience of AID, when the Contractor is unable to complete performance of his services * * * by reason of sickness or physical or emotional incapacity." In the event of a termination for cause, 10 days' notice was required, none of the Contractor's costs arising out of the termination would be reimbursed except the cost of return transportation, and the Contractor's right to compensation would cease *269 upon the earlier of the expiration of the period specified in the notice of termination or the last day upon which services were performed. In the case of a termination for convenience (not involving physical or emotional disability), 30 days' notice was required, certain additional travel allowance costs arising out of the termination would be reimbursed, and the Contractor's right to compensation would cease when the period specified in the notice expired. The General Provisions specifically noted that the Contractor could be terminated for failure to "show respect for the conventions, customs, and institutions of the cooperative country and not interfere in its political affairs." The project papers on which petitioner worked for USAID were reviewed by the chief of the Office of Private Enterprise Development, Mr. Reese Moyers, and then were required to be reviewed by several other offices of the USAID mission in Haiti. In connection with his work on the project papers for USAID, petitioner made frequent verbal progress reports to Mr. Moyers. The contract provided that petitioner was responsible for providing "all logistic support required in the performance of work * * * [thereunder] *270 with the exception of office space, equipment, secretarial assistance and official transportation in Haiti." Petitioner was provided with an office within the USAID mission site (for which he did not have to pay rent) and shared a secretary with Mr. Moyers. USAID also provided petitioner with supplies such as paper, photocopy equipment, and paper clips. Although the contract stated an expected completion date of October 19, 1984, petitioner continued to work as a personal services contractor at the USAID mission in Haiti through March 1989. In November 1984, a second contract (the second contract) was entered into between petitioner and USAID with an effective date of November 30, 1984, and an estimated completion date of February 27, 1985. The second contract contained a description of services almost identical to that contained in the appendix herein; one difference was that the statement of work for the second contract stated in paragraph 7 that petitioner would have the authority to make "recommendations," rather than "commitments," regarding project activities (subject, in both instances, to "overall policy guidance and budgetary limitations provided by [a] USAID Director *271 and supervisor"). In February 1985, petitioner signed a document under which the leave and holiday benefits he had accumulated under the contract were "transferred" to the second contract. In March 1985, petitioner signed an amendment to the second contract which extended his period of service for USAID until May 31, 1987, and increased the total amount budgeted for his services. Similar funding increases and contract extensions were provided for by contract amendments during 1987 and 1988. During 1986, a "meritorious increase" in pay was approved for petitioner. A memorandum recommending such increase, dated January 17, 1986, stated in relevant part: This is to request that a 5% meritorious increase be awarded to Criss Juliard's salary as of this date. No additional funding is required. Background C. Juliard is beginning his third year on a Personal Services Contract and to this date has not had a meritorious increase. Because of funding limitations, time restraints and security clearance requirements, Mr. Juliard has been subject to different contracts each with a series of extensions. Each contract was signed with a degree of urgency, and it was never expedient *272 to consider a salary increase either in the budget preparation or in the contract negotiations. The technical office feels that Mr. Juliard has performed with distinction and dedication. He has skillfully managed the Permanent Mixed Committee project which has required delicate negotiations mixed with forceful stands. He was able to stimulate and maintain a high degree of interest among the Board members of the Management and Productivity Center in spite of long delays imposed on project approval. He continues to pursue with vigor the export and investment promotion project design, in spite of numerous set backs requiring sound judgmental decisions in negotiations. His close and effective work with the more dynamic elements of the Haitian private sector has made measurable impact on setting a more positive image of AID and OPED. * * * Action requested: That Mr. Juliard be granted a salary increase of 5% beginning at third year of service at AID.
In 1988, petitioner requested and received approval of his eligibility for "R and R" (rest and recuperation) travel expenses, noting that, as of November 30, 1988, his contract would have been extended for 1 month short of *273 5 years. In their return for the year in issue on Form 1040, petitioners reported $ 39,522 (the amount reported by USAID on Form W-2) as "wages, salaries, tips, etc." on line 1 and then subtracted the same amount on line 22 ("other income") with the notation "Exclusion from Form 2555." The Form 2555 attached to the return reported foreign earned income of $ 39,522, listed the "name of employer" as "self (personal services contract)," and stated that the employer was an "Int'l Organization." A USAID address in Washington, D.C., in addition to a Haiti address, were noted in the spaces on Form 2555 provided for employer's addresses. The return claimed a refund of $ 8,056, the amount of Federal income tax withheld by USAID from payments to petitioner during the year in issue. In claiming the foreign earned income exclusion, petitioner read Internal Revenue Service Publication 54. The Publication stated that amounts paid by the United States or its agencies to persons who are not their employees may qualify as foreign earned income for the purpose of exclusion or deduction, but that amounts paid to employees of the United States or its agencies would not qualify. Petitioner also spoke *274 to an accountant in the United States and to other personal services contractors in Haiti about the availability of the section 911 exclusion. Petitioners did not pay any foreign income tax during the year in issue. OPINION For purposes of section 911, the parties are in agreement that petitioners were "qualified individuals" and that USAID is an agency of the United States Government. The sole issue in dispute is whether petitioner was an "employee" of USAID within the meaning of section 911(b)(1)(B)(ii) and thus not entitled to exclude his payments from USAID as "foreign earned income." Section 911 provides in relevant part: Sec. 911. Citizens or residents of the United States living abroad (a) Exclusion from gross income. -- At the election of a qualified individual (made separately with respect to paragraphs (1) and (2)), there shall be excluded from the gross income of such individual, and exempt from taxation under this subtitle, for any taxable year -- (1) the foreign earned income of such individual, and (2) the housing cost amount of such individual. (b) Foreign earned income. -- (1) Definition. -- For purposes of this section -- * * * (B) Certain *275 amounts not included in foreign earned income. -- The foreign earned income for an individual shall not include amounts -- * * * (ii) paid by the United States or an agency thereof to an employee of the United States or an agency thereof,
[Emphasis supplied.] The Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, sec. 111, 95 Stat. 172, 190 (ERTA), broadened the section 911 exclusion of foreign earned income by narrowing the exception applicable to payments from the U.S. Government or its agencies. Matthews v. Commissioner, 92 T.C. 351, 355-357 (1989), affd. 285 U.S. App. D.C. 167, 907 F.2d 1173, 1174-1175 (D.C. Cir. 1990). Prior to ERTA, the exclusion of income under section 911 did not apply to amounts "paid by the United States or any agency thereof." Subsequent to ERTA, however, such amounts may qualify for the section 911 exclusion when paid to "independent contractors," but not when paid to "employees" of the United States or its agencies. Sec. 911(b)(1)(B)(ii); H. Rept. 97-215 (Conf.) at 195, 204 (1981), 1981-2 C.B. 481, 486. Section 911 contains no definition of the term "employee." In Matthews v. Commissioner, supra, *276 the District of Columbia Circuit, the Circuit to which an appeal of the instant case would lie, focused on the absence of such a definition and found that: A plain reading of the 1981 statutory change gives no indication that the legislators envisioned applying other than the common law test for "employee." Indeed the most natural reading of the intent of the legislation depends on the distinction between common law employees and independent contractors. * * * The Conference Report, the only relevant piece of legislative history, gives no indication * * * that other than the common law definition of "employee" should apply to section 911. H.R. Rep. No. 215, 97th Cong., 1st Sess. (1981) * * * [907 F.2d at 1175.]
Courts have identified several factors to be considered in determining whether an employment relationship exists. Among them are (1) the right to control the manner in which the work is to be performed, (2) whether the individual performing the work has an opportunity for profit or loss, (3) the furnishing of tools and the work place to the worker, (4) the permanency of the working relationship, (5) whether the service rendered is an integral part *277 of the alleged employer's business, (6) whether services are offered to the general public rather than to one individual, (7) the right to discharge, and (8) the intent of the parties or the relationship they think they are creating. United States v. Silk, 331 U.S. 704, 716, 91 L. Ed. 1757, 67 S. Ct. 1463 (1947); Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988); Thomas Kiddie, M.D., Inc. v. Commissioner, 69 T.C. 1055, 1057-1058 (1978); Packard v. Commissioner, 63 T.C. 621, 629-630 (1975); 5 Restatement, Agency 2d, sec. 220 (1984). The "control" factor (the first factor noted above) overlaps many of the other factors and is often cited as the fundamental, or "master," test of an employment relationship. Matthews v. Commissioner, 92 T.C. at 361. The relative importance of each factor, however, is viewed under the facts and circumstances of each case. Bartels v. Birmingham, 332 U.S. 126, 91 L. Ed. 1947, 67 S. Ct. 1547 (1947); Packard v. Commissioner, supra.In that regard, when considering the employment status of a professional *278 person, it is well established that an alleged employer's control "'must necessarily be more tenuous and general than the control over nonprofessional employees.'" Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. at 234, quoting James v. Commissioner, 25 T.C. 1296, 1301 (1956). See also Azad v. United States, 388 F.2d 74, 77 (8th Cir. 1968). In the instant case, petitioner argues that the control he exerted over his own work was sufficient to preclude employee characterization. Petitioner testified at trial that his primary "tool" in performing his work was his own "gray matter," or "brain power," and argues on brief that he "was not required to design the project paper, attend meetings, interview businessmen or conduct surveys in any particular order; all these activities were done by his own initiative and scheduling." The same can be said, however, for many professionals, and we find that the authorities dealing with "control" over professionals are applicable herein. As we stated in James v. Commissioner, supra at 1301, "it cannot be doubted that many professional men are employees. *279 * * * there are many eminent lawyers who are fulltime employees of corporations and who carry on their professional work with a minimum of direct supervision or control over their methods on the part of the employer." Even applying a more stringent "control" test to petitioner, we conclude that USAID did retain a significant amount of "control," if not over petitioner's "gray matter" then over numerous other matters. The Statement of Work (see the appendix herein) contained a detailed list of the duties which petitioner could be "assigned" to perform, and the General Provisions contained additional details in addition to general policy guidelines. Petitioner also testified that he was required to follow certain guidelines contained in USAID handbooks in performing his duties. Moreover, his work was apparently done under the direct supervision of Mr. Moyers. Petitioner, at trial, characterized his submission of reports to Mr. Moyers as providing a product to his "client," and characterized his following of USAID guidelines as analogous to the situation of a builder who must conform to a building code. We, however, find the objective manifestations of the arrangement between *280 petitioner and USAID, which point to his status as an employee under the factors listed above, more persuasive than petitioner's analogies. Among those objective manifestations were USAID's rules with respect to hours, vacation, and other "leave"; USAID's right to fire petitioner for cause or for convenience; the manner in which petitioner was paid; the provision of office space and other supplies by USAID; and the apparent integration of petitioner into the USAID "staff" in Haiti. Petitioner emphasizes that he made use of his own computer and his own automobile in his performance of services, and describes the office he was provided with as a room on the second floor of a used car parts store. We find such facts insufficient to tip the scales in his favor in view of all of the other indications of his employee status. We note that the office provided to petitioner, however spartan, was part of USAID's regular headquarters in Haiti. Petitioner, moreover, apparently did not perform services or hold himself out as available to perform services for any entities other than USAID during the year in issue. Petitioner points to the short duration of the contract as evidence of his status *281 as an independent contractor. However, the numerous contract extensions which actually occurred suggest a relationship far more permanent than the contract alone would indicate. At trial, petitioner testified that his contracts with USAID "kept on being amended as funds were made available" and agreed that there were no other changes in contract terms. A memorandum contained in the contract file maintained by USAID with respect to petitioner explains that the contract "ran for only 10 months to utilize funds earmarked for FY84." Under the circumstances, we believe that, during the year in issue, both petitioner and USAID contemplated a continuing relationship, contingent upon the availability of funds. In that regard, however, we note that the regulations governing personal services contracts during the year in issue (contained in 41 C.F.R., chapter 7, appendix F, before being moved to 48 C.F.R.) contain a statement that "contracts entered into pursuant to this authority may not exceed 5 years." As stated above, the contract gave petitioner the authority to make "commitments" regarding project activities, whereas the second contract only gave him the authority to make "recommendations." *282 Petitioner argues that the amount which respondent seeks to include in his income was received solely under the contract and that it is therefore inappropriate to focus on such difference between the contract and the second contract. Petitioner also testified that, as a personal services contractor, he was never authorized to make commitments of the U.S. Government. We find it unnecessary to decide whether any amounts were received during the year in issue pursuant to the second contract, and note that our holding does not rest on a comparison between the contract and the second contract, or on whether petitioner could, at any time, make "commitments" of the U.S. Government. Focusing on the manner in which petitioner was paid, petitioner's compensation looked more like an employee's than an independent contractor's compensation. Petitioner earned a salary and was reimbursed for expenses. He was not in a position to increase his profit by his own actions and he was not at risk for loss. Petitioner points to the fact that the contract by its terms obligated USAID to pay him only "at the end of the contract period." While the contract does contain such a statement, it also cross-references *283 to the General Provisions regarding payment vouchers, which state that such vouchers may be submitted once each month or more frequently, if approved. Petitioner admits that he was paid upon the submission of vouchers, albeit with significant time delays. We also find the apparent provision of a "meritorious" pay raise to petitioner wholly inconsistent with independent contractor status. We recognize that Mrs. Patricia Bullock, who was involved in drafting regulations applicable to USAID personal services contracts, testified that personal services contractors were treated differently than direct hires with respect to "health and life insurance and retirement." Petitioner also testified that he was not entitled to any Civil Service benefits. We recently have held, however, on very similar facts, that a personal services contractor's ineligibility for benefits administered by the Civil Service Commission is not determinative of her status for tax purposes. Matt v. Commissioner, T.C. Memo 1990-209. Moreover, our conclusion is not altered by the various other items which petitioner claims distinguished personal services contractors from USAID employees, such *284 as: the granting of diplomatic passports to employees but not personal services contractors, the provision of preselected housing to U.S. Government employees but not personal services contractors, the provision of radios (as part of a safety network) to USAID employees but not personal services contractors, different staff meetings including or excluding personal services contractors, the ineligibility of personal services contractors to take language proficiency tests in order to qualify for pay increases, the payment of personal services contractors from a source of funds allegedly not used for employees, and less convenient access to free drinking water for personal services contractors than employees. Turning to the intent of the parties to the contract, the language contained in Federal regulations governing USAID personal services contracts, and USAID's actions in requiring a Form W-4 and withholding employment taxes with respect to petitioner, indicate that USAID's intent was that petitioner would be an employee. Mr. Frank Bettucci, the executive officer of USAID in Haiti during the year in issue, also provided the following testimony concerning USAID's use of the title *285 "contractor" to describe petitioner in its staffing pattern document: Q: An when it says contractor for Mr. Juliard, what does that refer to? A: Contractor? That refers, I believe, to Mr. Juliard as a contractor. Q: It says he's not an employee; that he is a contractor? A: A contractor can be an employee. In this case, as a PSC, he would have had an employee relationship with the Agency for International Development.
We also note the statement in the contract's General Provisions that the Contractor: shall, during his tour of duty under this Contract, be considered an "employee" (or if his tour of duty is for less than 130 days, a "special Government employee") for the purposes of, and shall be subject to, the provisions of AID Handbook 24, Chapter 3.
Such statement, combined with USAID's actions regarding withholding, should have put petitioner on notice of USAID's possible intention to treat him as an employee. Moreover, the use of the label "contractor," rather than "employee," in petitioner's contracts is not determinative for tax purposes. Bartels v. Birmingham, 332 U.S. 126, 91 L. Ed. 1947, 67 S. Ct. 1547 (1947). See also Boulez v. Commissioner, 83 T.C. 584, 591 (1984). *286 Petitioner attempts to negate the effect of various factors indicating an employer-employee relationship by arguing on brief that his arrangements with USAID were the product of "negotiations." The implication of petitioner's argument is that one cannot negotiate at arm's length to become another's employee. We disagree. The fact that petitioner was, prior to entering into the contract, free to accept, or not accept, various terms, does not alter the relationship created by such terms once accepted. Moreover, although "A contract purporting to create an employer-employee relationship will not control where the common law factors (as applied to the facts and circumstances) establish that the relationship does not exist," Professional & Executive Leasing Inc. v. Commissioner, 89 T.C. 225, 233 (1987), affd. 862 F.2d 751 (9th Cir. 1988), petitioner has not persuaded us that the instant case is an appropriate occasion for the invocation of such principle. Petitioner finally argues that he should not be treated as an employee of USAID because his work for USAID represented a mere continuation of his work as an independent contractor for PFP. Petitioner *287 also suggests that his relationship with USAID should be equated with PFP's earlier relationship with USAID. Apart from certain testimony regarding compensation and benefits from PFP, however, petitioner has not submitted significant evidence of his contractual arrangement with PFP or of PFP's contractual arrangement with USAID. We therefore are unable to compare meaningfully the arrangements to which petitioner refers with the situation existing during the year in issue. Based on the foregoing, we hold that, during the year in issue, petitioner was an employee of USAID. Accordingly, the amounts paid to petitioner by USAID during the year in issue do not qualify as foreign earned income under section 911. Addition to Tax for Negligence
Respondent also determined additions to tax for negligence under section 6653(a) for the year in issue. Petitioners bear the burden of proving respondent's determination under section 6653(a) in error. Rule 142(a). Petitioners argue that the section 6653(a) addition is inappropriate in view of petitioner's reliance upon IRS Publication 54, his reliance upon an accountant, and his awareness of the use of the section 911 exclusion by other *288 USAID workers. Petitioners also argue that they fully disclosed their position in their return and characterize their situation as an "honest misunderstanding of the law." We find that petitioners have met their burden of proof on the negligence issue. Petitioner discussed the section 911 exclusion with an accountant and was aware of other USAID workers who claimed the exclusion. Upon review of the record as a whole, we conclude that petitioners "acted reasonably and prudently and exercised due care" with respect to their treatment of the payments from USAID. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Accordingly, we hold for petitioners on the negligence addition. To reflect the foregoing, Decision will be entered for the respondent without the additions to tax. APPENDIX Statement of Work
I. Nature and Scope of Work
Overall responsibility for designing, managing, monitoring and coordinating assigned private sector projects and for evaluating the progress and effectiveness of these activities. Specific responsibility will be the management of the Private Enterprise Productivity Center project and the Investment Authority project. *289 II. Representative Duties
Management of the above two projects as well as other assigned duties which will include: 1. Analysis and review of new project proposals, including OPG proposals with international and local organizations. Duties will include discussions with recipient organizations on project design, analysis of proposals, work with recipient organizations to make adjustment in proposals following Mission review, drafting project agreements and coordination of signature of agreements. 2. Drafting and translating Project Implementation Letters (PILs), Project Agreement (ProAgs), Project Agreement Amendments and Project Implementation Orders (PIO's); maintaining working level contacts with implementing institutions, and participating in project status reviews. Negotiating clearances of official project documents through various host government offices and ministries. 3. Gathering information and performing analyses required for Project Identification Documents, Project Papers or Project Paper Amendments; establishing and maintaining technical level contracts with counterpart organizations; and conducting discussions on project design aspects with potential *290 implementation agencies and outside experts. 4. Participating in evaluations of projects managed by OPED. Duties will include visits to and discussions with implementing agency personnel and project beneficiaries to determine project status and impact. 5. Preparing periodic status reports for Mission review on status of new and/or on-going projects managed by OPED. 6. Assist USAID/Haiti in drawing resources and support for Private Sector activities from AID/Washington centrally funded projects. 7. Representing USAID with counterpart organizations with authority to make commitments regarding project activities in this area, subject to overall policy guidance and budgetary limitations provided by USAID Director and supervisor. Contacts will be principally with working or technical level personnel of counterpart organizations (governmental and non-governmental) for the purpose of discussing the elements of projects being designed or implementation problems with on-going activities, coordinating signature of official project documentation, and obtaining clearance on the content of various implementing documents (PILs, PIOs). Occasionally these contacts will include higher level *291 officials, including the principal officer of non-governmental organizations with whom the incumbent is working and Sub-Secretary or Director-General of a GOH Department. In addition, the incumbent will make contacts at all levels within USAID as required to discuss and analyze project activities. Footnotes
*. plus 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard pursuant to section 6653(a)(2).↩