ALBERT McCARROLL MARCKWARDT and GLORIA SUAREZ MARCKWARDT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marckwardt v. Commissioner
Docket No. 13400-89
United States Tax Court
T.C. Memo 1991-347; 1991 Tax Ct. Memo LEXIS 395; 62 T.C.M. (CCH) 262; T.C.M. (RIA) 91347; July 29, 1991, Filed *395 Decision will be entered under Rule 155. Albert McCarroll Marckwardt and Gloria Suarez Marckwardt, pro se. Susan T. Mosley, for the respondent. PARKER, Judge. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income tax in the amounts of $ 16,696 and $ 21,077 for the years 1985 and 1986, respectively. Respondent also determined the following additions to tax: Year
Additions to Tax
[1]Sec.6653(a)(1) Sec.6653(a)(1)(A)
Sec.6661(a)
1985
$ 834.80 *
--
$ 4,174.00
1986
--
$ 1,053.85 **
$ 5,269.25
After concessions, [2] the issues for decision are (1) whether petitioner *396 Albert McCarroll Marckwardt was an "employee of the United States or an agency thereof" within the meaning of section 911(b)(1)(B)(ii), or an independent contractor for purposes of the exclusion for "foreign earned income" under section 911; and (2) whether he is liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached *397 thereto are incorporated herein by this reference. Petitioners, Albert McCarroll Marckwardt and Gloria Suarez Marckwardt, lived in La Paz, Bolivia, at the time they filed their petition. Petitioners were cash method, calendar year taxpayers filing joint Federal income tax returns for 1985 and 1986. All references to petitioner in the singular will be to Albert McCarroll Marckwardt. Petitioner holds a Doctor of Philosophy degree in sociology, with a specialization in demography. In 1985 and 1986 he was working in Peru under a written contract with the United States Agency for International Development (USAID), an agency of the United States Government. Petitioner was "a qualified individual" within the meaning of section 911(d)(1) each year he worked for USAID. USAID is part of the United States International Development Cooperation Agency (IDCA). IDCA establishes the overall development assistance policy of the United States and coordinates the international development activities that are supported by the United States. As its part of these activities, USAID supplies information, technical advice, supplies, and personnel to foreign countries for particular projects. Such *398 activities are generally funded through the use of funds appropriated by the Congress ("appropriated funds"). In some cases, however, the host country will make a "counterpart contribution," providing some funds or equipment and supplies for the particular project. USAID has three categories of personnel: (1) direct hires; (2) personal services contractors (PSCs); and (3) nonpersonal services contractors (NPSCs). Direct hires do not have written employment contracts, but are employed by appointment for an open-ended term like most Federal employees. PSCs and NPSCs have written employment contracts and are hired for a specific period of time. All three categories of USAID personnel may be assigned to work overseas. The method under which a person is hired depends upon the needs of the individual project rather than the type of services to be performed. In some cases direct hires and PSCs perform equivalent services; in some cases PSCs and NPSCs perform equivalent services. Either the host country or USAID may enter into a contractual agreement with the individual. The host country may enter into a contract with the individual when it wishes to control the terms and conditions *399 of the contract and when it wishes to control the selection of who will do the work. In the instant case, USAID entered into a contractual agreement with petitioner. In 1985, petitioner entered into a PSC contract with USAID to provide technical assistance to the Peruvian Ministry of Health (MOH) in its National Statistical Institute (INE). Petitioner's job was to analyze the data from a certain survey that had already been conducted by Peru, the National Nutrition and Health Survey (ENNSA). The ENNSA was a survey of 18,000 Peruvian households containing 50 questions concerning health, nutrition, and demographic data. The survey had been created and conducted by the Peruvian Government (MOH) but had been funded by both MOH and USAID. USAID, however, provided no personnel to conduct the survey, nor to collate or statistically analyze the data once collected. Westinghouse, an institutional contractor to USAID, had provided an ENNSA coordinator, whose job was to have included such statistical analysis and publication of the ENNSA data in usable form. However, the ENNSA coordinator had not accomplished that task by the time the Westinghouse contract terminated. Petitioner essentially *400 took over that task as the ENNSA coordinator was phasing out. Thus, the proposed duties of the ENNSA coordinator as to that task were similar to the duties petitioner assumed under his contract. Petitioner's contract, entitled "CONTRACT WITH A U.S. CITIZEN OR U.S. RESIDENT FOR PERSONAL SERVICES ABROAD," stated that it was not a contract for consulting services and was not a contract for studies and/or reports. Under USAID regulations such PSC contracts are deemed to create an employer/employee relationship. Under his contract in 1985 and 1986, [3] petitioner was the advisor to the Analysis Group of ENNSA in Peru. The ENNSA analysis group was an association financed by both MOH and USAID. USAID provided the primary source of funds while the Government of Peru's counterpart contributions included such things as office space, supplies, computer facilities, and staff other than petitioner. As noted above, petitioner's job as analysis group advisor phased in as the position of ENNSA coordinator was phasing out. Neither MOH nor USAID had any other staff person with petitioner's particular statistical skills and training. *401 Essentially, petitioner advised the people in the analysis group who produced the reports interpreting the ENNSA survey data. Petitioner's contract with USAID stated that its objective was -- to provide technical support to the Ministry of Health Analysis Group which has been established officially to ensure that the data from the National Nutrition and Health Survey (ENNSA) are fully utilized in the development of the MOH planning and programming system in order to improve nutrition and health strategies, policies and interventions.
The Health and Nutrition Office of USAID determined petitioner's tasks as set out in his contract. The contract defined the scope of petitioner's work as follows: 1.
Assist the Analysis Group in developing and
implementing an analysis plan designed to provide
information required by [MOH] decision makers to
improve efficiency and coverage of the health
system.
2.
Assist the Analysis Group to develop and implement
a training plan which will enable them to fully
exploit the ENNSA data. The Contractor will carry
out training in his own areas of expertise, and
will assist the Group to identify resources for
training in other areas.
3.
Assist the Group to carry out the required analysis
and/or identify other investigators who can carry them
out.
4.
Assist the Group to provide the information from
the ENNSA to decision makers when needed, and in a
readily understandable format.
5.
Assist the Group to identify areas for operations
research in health and nutrition, utilizing the
ENNSA data or building on the results.
6.
Support the development of the institutional
infrastructure for analysis and operations
research in the Ministry of Health, including
linkages with private sector institutions.
7.
Integrate ENNSA data and analysis with data from
other surveys (e.g., comparision [sic] with the
National Food Consumption Survey (ENCA) and World
Fertility Survey (WFS)) and from the health
facilities. Special attention will be given to
using the ENNSA to support the development of the
health information system.
8.
Assist the Analysis Group and INE to support other
users of the ENNSA data, both within and outside
of the MOH, e.g., the National Population Council,
the Health Sector Analysis Team (ANNSA), the
Centers for Disease Control (CDC), international
donor organizations, and AID contractors such as
Sigma One Corporation.
9.
Provide or obtain expert advice for the Analysis
Group and other users of the data on statistical
analysis and interpretation of results,
particularly taking into account the size and
design of the sample.
10.
Assist the Group to make efficient use of
resources available from A.I.D. and other donors
for data analysis.
11.
Provide technical assistance to the National
Population Council in the processing and analysis
of their KAP surveys of contraceptive use which
are being carried out in several regions of the
country.
12.
Support the National Statistics Institute (INE) in
finalizing the first official publication of the
ENNSA data and its documentation and hosting a
workshop on the results.
*402 The INE provided petitioner with office space, supplies, secretarial services, and computer facilities. Petitioner never had an office in the USAID building while working in Peru. [4] Approximately twice a week, he would go to the USAID mission to pick up his mail. At these times, he would, through informal discussions, inform the people at the mission of his progress. He was not required to prepare regular progress reports to the mission, and his performance was not evaluated by anyone at the mission. The people he spoke with at the USAID mission in Peru were all direct hires who did not have the experience and expertise to evaluate petitioner's work. In 1986, petitioner and USAID mutually agreed to modify his contract. The objective of the *403 modified contract was "to provide technical support to USAID/Peru, the Ministry of Health, Peruvian PVOs [private volunteer organizations], and universities in analysis and interpretation of data from the ENNSA so that they are fully utilized to improve targeting and design of health and nutrition strategies, policies, and interventions." During the first year of his contract, petitioner advised the group which finally completed the survey report for the INE, i.e., the analysis and publication of the ENNSA survey data, the report that should have been completed by the ENNSA coordinator. That report was a 500-page book that compiled the raw survey data into a usable and useful form. Petitioner's time was divided during the second year of his contract. Petitioner spent approximately half of his time with the National Nutrition Institute, analyzing ENNSA data and developing a comparative analysis between ENNSA and earlier health and nutrition surveys. Petitioner spent the other half of his time with the INE carrying out a new demographics and health survey in Peru. The Chief of Health of the Office of Nutrition and Education, a USAID direct hire, determined how petitioner's time *404 was to be allocated. However, petitioner also participated in this determination. Because the above projects have been completed, there is now no one at USAID/Peru who is performing the services previously performed by petitioner under his contract. Only under the contract as modified for 1986 was express reference made to petitioner's providing technical support to USAID/Peru. The record does not disclose the specific nature of the technical support he provided to USAID/Peru. However, he did prepare an annual demographic situation sheet, a type of fact sheet, for the USAID Population Officer. He also prepared for the United States Ambassador a report on sterilization based on data from the health survey. The data generated by and compiled from the ENNSA survey was used particularly to aid the Health Sector Analysis Team, a group of medical specialists designated by the Vice Minister of Health in Peru. USAID did not directly use such data, except in the sense that it used similar data in projects in various foreign countries; namely, USAID was interested in having such data produced and made available for other users in the host country and elsewhere. USAID might also use *405 the data to determine whether and to what extent to fund future projects. [5] The primary beneficiary of the ENNSA data was the Peruvian Government, specifically the MOH. However, the direct users of the ENNSA data were both within and outside of MOH. Such direct users included the National Population Council, the Health Sector Analysis Team, the Centers for Disease Control, the international donor organizations, and USAID contractors. Other potential beneficiaries and users included universities, students of health and nutrition, and the World Health Organization. Petitioner was paid by USAID out of appropriated funds through direct deposit into petitioner's bank account in the United States. USAID withheld Federal income tax and social security taxes from *406 petitioner's compensation. USAID paid the employer's portion of the social security taxes. In order to receive payment, petitioner submitted vouchers once a month to the Health and Nutrition Office of USAID (the Office). Petitioner was not required to work a 40-hour week but he usually did so; his compensation was approximately $ 57,000 a year but was paid at a certain daily rate. Petitioner was also entitled to sick leave (13 days per year) and vacation leave. Petitioner listed on the vouchers the number of days worked and the number of leave days taken during each month. No one at the USAID Office verified the number of hours that petitioner worked. The USAID Office simply processed the vouchers so that petitioner would get paid. Petitioner's pay for the first contract term was $ 57,000 per year, apparently based on his prior consulting fee with the World Fertility Survey in London. He received a pay increase to $ 61,560 effective July 1, 1986. In addition to his daily rate, petitioner received a housing allowance, an allowance for moving expenses, and, beginning in 1986, post differential or danger pay. The amounts of these allowances were not included in petitioner's *407 W-2 Wage and Tax Statements. Employees of institutional contractors of USAID, such as Westinghouse, also received various allowances, although they were paid by the institutional contractor rather than by USAID. [6]USAID also provided furniture and household equipment for petitioner. Petitioner also received an allowance to cover his children's education while they were in Peru. After the first year, petitioner was eligible for rest and recuperation travel. USAID reimbursed petitioner for travel expenses he incurred. USAID did not, however, reimburse petitioner for local mileage in Peru even though he used his own car. Petitioner's contract could be terminated by him or by USAID upon 15 days' written notice, but the Government of Peru could not terminate it. In 1985 petitioner was paid $ *408 27,732.58 by USAID as compensation for services rendered, which amount was reflected on his W-2 Form. Social security taxes in the amount of $ 1,955.15 were withheld that year. In 1986 petitioner was paid $ 69,510.10 by USAID as compensation for services rendered, which amount was reflected on his W-2 Form. That year social security taxes of $ 3,003 were withheld. Petitioner apparently reported as income some portion of the allowances he received, although these amounts were not included on his W-2 Forms. See supra note 2. Petitioner did not pay any income taxes to the Government of Peru either year. The Peruvian Government imposes an income tax on its own citizens and on noncitizen residents who work in Peru. The Peruvian Government did not impose an income tax on petitioner or on other American citizens like him who had been issued official visas to work on these particular USAID projects. OPINION I. Foreign Earned Income Exclusion
Section 911(a) provides: (a) Exclusion from Gross Income. -- At the election of a qualified individual (made separately with respect to paragraphs (1) and (2)), there shall be excluded from the gross income of such individual, *409 and exempt from taxation under this subtitle, for any taxable year -- (1) the foreign earned income of such individual, and (2) the housing cost amount of such individual.
During the years before the Court, petitioner was "a qualified individual" and the question is whether he received "foreign earned income." "Earned income is from sources within a foreign country if it is attributable to services performed by an individual in a foreign country or countries * * *." Sec. 1.911-3(a), Income Tax Regs. Excluded from the definition of "foreign earned income," however, are amounts "paid by the United States or an agency thereof to an employee of the United States or an agency thereof." Sec. 911(b)(1)(B)(ii); sec. 1.911-3(c)(3), Income Tax Regs.
Since petitioner was paid by USAID and since USAID is an agency of the United States, the sole issue is whether petitioner was an independent contractor or an employee of USAID. Common-law concepts determine the existence of an employer/employee relationship for tax purposes. Professional & Executive Leasing v. Commissioner, 89 T.C. 225, 231 & n.10 (1987), affd. 862 F.2d 751 (9th Cir. 1988). Among *410 the factors to which the Court may look in determining whether such a relationship exists are "(1) the degree of control exercised over the details of the work; (2) investment in the work facilities; (3) opportunity for profit or loss; (4) whether the type of work is part of the principal's regular business; (5) right to discharge; (6) permanency of the relationship; and (7) the relationship the parties think they are creating." Professional & Executive Leasing v. Commissioner, 89 T.C. at 232 (citing United States v. Silk, 331 U.S. 704, 716, 91 L. Ed. 1757, 67 S. Ct. 1463 (1947)). While the degree of control exercised over the details of the work is important, the crucial test lies in the right to control (1) the manner in which the service is to be performed; (2) the means to be used in its accomplishment; and (3) the result to be obtained. Matthews v. Commissioner, 92 T.C. 351, 361 (1989), affd. 285 U.S. App. D.C. 167, 907 F.2d 1173 (D.C. Cir. 1990) (citing Reed v. Commissioner, 13 B.T.A. 513 (1928), revd. and remanded 34 F.2d 263 (3d Cir. 1929), revd. per curiam 281 U.S. 699 (1930)). The right to control *411 is determinative, and it is not necessary that any control actually be exercised. Moreover, the absence of the need to control should not be confused with the absence of the right to control. Air Terminal Cab, Inc. v. United States, 478 F.2d 575, 580 (8th Cir. 1973). In the present case, USAID did not relinquish the right to control petitioner's work. As is often the case with highly skilled professionals, petitioner's work was not supervised or controlled on a day-to-day basis, simply because no one at the USAID mission had the necessary expertise to do so. This factor, however, is not to be construed as requiring every highly skilled professional to be treated as an independent contractor for Federal tax purposes. As this Court noted in James v. Commissioner, 25 T.C. 1296, 1301 (1956), "the control of an employer over the manner in which professional employees shall conduct the duties of their positions must necessarily be more tenuous and general than the control over nonprofessional employees * * *." It is clear from an analysis of the remaining factors set out in Professional & Executive Leasing v. Commissioner, supra, *412 that petitioner was an employee of an agency of the United States in 1985 and 1986. Petitioner had no investment in the work facilities. The INE provided petitioner with office space, secretarial services, and computer facilities as part of the host country's counterpart contribution to the project. See Professional & Executive Leasing v. Commissioner, 89 T.C. at 234. Petitioner had no opportunity for profit or loss. The amount of pay he received depended only upon the number of days he worked. While petitioner was given a project to complete, the amount he would earn was in no way dependent upon completion of the project. As noted above, USAID's function is to provide information, technical advice, supplies, and personnel to foreign countries in support of various projects. Petitioner's assignment was to provide technical advice and assistance to the ENNSA analysis group. This type of work was clearly within the scope of the regular business of USAID. See supra note 5. Petitioner and USAID entered into an employment contract for a specific term, initially for one year and later extended for a second year. Although this did not create a permanent *413 employment relationship, this factor alone does not preclude a finding that petitioner was an employee. USAID did retain the right to discharge petitioner at any time during the contract term. Finally, the parties, or certainly USAID, intended to create an employer/employee relationship when they entered into the contract. USAID withheld income tax and social security taxes from petitioner's monthly paychecks. USAID paid the employer's portion of the social security taxes. Petitioner earned sick leave and vacation leave. He received various allowances and a post differential, and was eligible for rest and recuperation travel after the first year. Some of the allowances were excludable from income under section 912 and were excluded from petitioner's W-2 Wage and Tax Statements. Moreover, the regulations relating to USAID contracts state that the type of contract entered into with petitioner, a Professional Services Contract, creates an employer/employee relationship. See generally 41 C.F.R., chapter 7 of appendices (1985). There are, however, a few factors that may tend to suggest that petitioner was an independent contractor rather than an employee of USAID. For example, *414 petitioner was not required to work a 40-hour work week. He determined the necessary means to produce the statistical report and the manner in which it was produced. Both petitioner and USAID personnel participated in the 1986 contract modifications and in determining how petitioner's time was to be allocated during the second year. We find, however, that the few factors indicating petitioner was an independent contractor are far outweighed by those indicating he was an employee of USAID. Based on all of the facts and circumstances of this case, we find as a fact that petitioner was an employee of an agency of the United States. The conclusion we have reached in this case is consistent with the legislative purpose of section 911. The purpose of section 911, as originally enacted, [7] was to promote foreign trade and to place United States citizens living and working abroad on a par with citizens of other countries who were also working abroad. S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 458, 495; H. Rept. 1, 69th Cong., 1st Sess. (1925), 1939-1 C.B. (Part 2) 315, 320; 75 Cong. Rec. 10410-10411 (1932) (Statement of Sen. Reed). However, *415 from 1932 to 1981, any person paid by the United States or one of its agencies was excluded from the class of persons covered by section 911. S. Rept. 665, 72d Cong., 1st Sess. (1932), 1939-1 C.B. (Part 2) 496, 518; 75 Cong. Rec. 10410 (1932) (Statement of Sen. Reed). In 1981, the Congress extended the benefits of section 911 to independent contractors but not to employees of the United States; it did this by amending the definition of "foreign earned income" to exclude only amounts paid by the United States or one of its agencies to one of its employees. Sec. 111(a) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 190. The Conference Report accompanying the Economic Recovery Tax Act of 1981 explains this provision as follows: The bill extends the benefits of the exclusion to individuals who receive compensation from the U.S. or any agency thereof, *416 but who are not employees of the U.S. or any agency thereof. Thus, for example, the bill extends the exclusion to certain overseas independent contractors and teachers at certain schools for U.S. dependents who are not employees of the U.S. or any agency thereof.
H. Rept. 97-215 (Conf.) (1981), 1981-2 C.B. 481, 486. Although this language is not particularly helpful in ascertaining the purpose of excluding only United States employees from the benefits of section 911, the report of the House Ways and Means Committee does shed some light on this issue. The House report explains this provision as follows: The bill extends the benefits of the exclusion to individuals who are paid by the United States but who are not eligible for any exclusion under section 912 or any other provision of U.S. law. As a general rule, therefore, employees of the Federal Government will not be eligible for the exclusion.
H. Rept. 97-201 (1981), 1981-2 C.B. 352, 355. The conference agreement follows the House bill. Thus, the benefit of the foreign earned income exclusion seems to have been extended to independent contractors of the United States and its *417 agencies to compensate for the fact that they were not eligible for the benefits of section 912. Section 912 excludes from gross income certain allowances received by employees of the United States and Peace Corps volunteers. Petitioner here received some of the allowances that are excludable from gross income under section 912, and respondent concedes that if the Court concludes that petitioner is an employee, then he is entitled to the exclusion of those amounts from his gross income. See supra note 2. Respondent also argues that petitioner should not be allowed to benefit from the section 911 exclusion because petitioner did not pay any taxes to the Peruvian Government. While the Congress has not explicitly required that the person claiming the foreign earned income exclusion must have paid tax to a foreign country, the legislative history of section 911 and its predecessors makes it clear that generally the foreign governments did not impose tax on employees of the United States and that the Congress did not intend foreign earned income to escape taxation altogether. 75 Cong. Rec. 10410-10411 (1932) (Statement of Sen. Reed); S. Rept. 1631, 77th Cong., 2d Sess. (1942), *418 1942-2 C.B. 504, 548. See also Smith v. Commissioner, 701 F.2d 807, 809 (9th Cir. 1983), affg. 77 T.C. 1181 (1981); Soboleski v. Commissioner, 88 T.C. 1024, 1030 (1987), affd. without published opinion 842 F.2d 1292 (4th Cir. 1988). "It is also clear that the exception for employees of the United States or any agency thereof was designed to prevent United States government employees from obtaining a windfall under subsections 911(a)(1) or 911(a)(2)." McComish v. Commissioner, 580 F.2d 1323, 1326 (9th Cir. 1978), revg. 64 T.C. 909 (1975). Here petitioner did not pay any taxes to the Government of Peru, and the facts show that he was an employee of an agency of the United States. Thus he was clearly not a person intended to benefit from the exclusion of section 911(a), even as liberalized in 1981. [8]
*419 II. Additions to Tax
The next issue is whether or not petitioner is liable for the additions to tax for negligence or intentional disregard of rules and regulations. Section 6653(a)(1) (or section 6653(a)(1)(A)) provides for an addition to tax of five percent of the underpayment if any part of the underpayment "is due to negligence or intentional disregard of rules or regulations * * *." Section 6653(a)(2) (or section 6653(a)(1)(B)) provides for an addition to tax of 50 percent of the interest due on the portion of the underpayment attributable to the negligence or intentional disregard. Under the particular facts of this case, the Court is satisfied that petitioner was not negligent and did not intentionally disregard rules or regulations. Before the years at issue, petitioner had worked for six years in Peru providing technical assistance to the Peruvian Ministry of Labor on a project involving USAID. Petitioner was at that time an employee of the University of Michigan which was an institutional contractor to USAID. As an employee of the University of Michigan, petitioner could properly exclude his foreign earned income under section 911(a). Petitioner's predecessor, *420 the ENNSA coordinator, was employed by Westinghouse, another institutional contractor of USAID, and presumably that individual's income too could constitute excludable "foreign earned income." Against that background, petitioner could reasonably have believed that he was not an employee even under his contract with USAID. [9] Petitioner's work was not actively supervised by USAID personnel. He did not work alongside other USAID employees, but worked with employees of the Peruvian Government. Moreover, petitioner's Personal Services Contract referred to him as "contractor." Thus, petitioner could have reasonably believed that he was an independent contractor of an agency of the United States and thus entitled to the benefits of section 911(a). The issue this Court had to resolve was intensively factual in nature, and merely because the issue was resolved against petitioner does not mean that he was negligent or intentionally disregarded rules and regulations. *421 On the record before us, we conclude that petitioner did not act with negligence or intentional disregard of rules and regulations. Therefore, petitioner is not liable for additions to tax under section 6653(a). To reflect the above holdings, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Also 50 percent of interest due on $ 16,696 under sec. 6653(a)(2)↩. **. Also 50 percent of interest due on $ 21,077 under sec. 6653(a)(1)(B)↩. 2. Respondent has conceded the additions to tax under section 6661(a). Respondent has also conceded that if petitioner Albert McCarroll Marckwardt is found to be an employee of the United States or an agency thereof, then certain allowances reported in income are excludable under section 912, and therefore the deficiencies determined in the notice of deficiency may be overstated. The amounts of the various allowances that may be excludable under section 912 will be determined in the Rule 155 proceedings, if necessary.↩
3. Petitioner actually worked pursuant to a purchase order for the period April 1, 1985 through May 10, 1985 before the PSC contract was executed. However, neither party has suggested that the result in this case would be different under the purchase order as opposed to the PSC contract.↩
4. Prior to 1985 petitioner had worked in Peru for some six years, providing technical assistance to the Peruvian Ministry of Labor. Although USAID was involved in that Ministry of Labor project, petitioner was during that project an employee of the University of Michigan.↩
5. In suggesting that USAID did not "use" the ENNSA data reports, petitioner seems to focus on USAID's own internal agency operations as opposed to furtherance of its international mission and foreign policy goals. We think the proper focus is on the latter.↩
6. We note that various allowances that may be excludable from gross income by employees of the United States or an agency thereof under section 912 would not be so excludable by employees of these institutional contractors.↩
7. Formerly section 213(b)(14) of the Internal Revenue Code of 1926 and section 116(a) of the Internal Revenue Code of 1928↩.
8. See also Juliard v. Commissioner, T.C. Memo 1991-230, and Matt v. Commissioner, T.C. Memo 1990-209↩, where the Court reached the same result in other cases involving USAID employees.
9. The Court is somewhat troubled by the fact that petitioner failed to pay self-employment taxes as an independent contractor. Even if the income were excludable as foreign earned income of an independent contractor of the United States, the section 911(a)↩ exclusion is disregarded in computing self-employment income. Sec. 1402(a)(11). However, since petitioner had previously been a longtime employee of the University of Michigan, he may well have been unaware of the fine points of self-employment taxes.