T.C. Memo. 1995-493


UNITED STATES TAX COURT


WILLIAM H. ADAIR AND PATRICIA ADAIR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5731-93.                    Filed October 12, 1995.


    Pursuant to the U.S. Code, U.S. employees may be
either detailed or transferred to international
organizations for foreign service.  P was transferred
from the U.S. Army to NATO.  For years after 1981, sec.
911, I.R.C., was amended to exclude from the definition
of foreign earned income amounts "paid by the United
States or an agency thereof to an employee of the
United States or an agency thereof".  <u>Held</u>:  P was an
employee of NATO, and not an employee of the United
States.


<u>Daniel Harvey FitzGibbon</u>, for petitioners.

<u>Brian M. Harrington</u>, for respondent.

MEMORANDUM OPINION

KÖRNER, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the years 1988, 1989, and 1990 in the respective amounts of $22,641, $14,864, and $12,568. Petitioners timely filed their 1988, 1989 and 1990 U.S. Individual Income Tax Returns, Forms 1040, as married filing jointly. Pursuant to an extension of time agreed to by petitioners and respondent for the year 1988, the statutory notice of deficiency with respect to the taxable years 1988, 1989 and 1990 was timely mailed to petitioners on November 16, 1992.

This case was submitted under Rule 122. The stipulation of facts and the attached exhibits are incorporated herein by this reference. All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

Petitioners were residents of Brussels, Belgium, when they filed their petition. Patricia Adair is a party to this proceeding solely by virtue of having filed joint income tax returns with her husband; consequently, all references to petitioner hereinafter will be to William H. Adair. The controversy for decision is whether section 911 exempted petitioner from taxation as to a portion of his income during the years in issue while performing services for the North Atlantic Treaty Organization (NATO) as a transferee from the U.S. Army.

1. <u>NATO</u>

NATO is an organization of sovereign states created by the North Atlantic Treaty (treaty). 63 Stat. 2241 (1949), T.I.A.S. 1964, 34 U.N.T.S. 243. The original signatory states included the United States of America, the Kingdom of Belgium, Canada, the Kingdom of Denmark, France, Iceland, Italy, the Grand Duchy of Luxembourg, the Kingdom of the Netherlands, the Kingdom of Norway, Portugal, and the United Kingdom of Great Britain and Northern Ireland.

NATO was organized in order to promote stability and well-being in the North Atlantic region. The parties to the treaty seek to preserve peace and security and to unite efforts for their collective defense. Treaty Art. 2, 63 Stat. 2243.

Article 9 of the treaty created the North Atlantic Council (council), a body on which each of the parties would be represented. This council is the highest decision-making body in NATO and is composed of permanent representatives appointed by each of the NATO member states. The Council created various committees which were supported by an international staff drawn from all member states.

Member states entered into an additional agreement entitled the Agreement on the Status of the North Atlantic Treaty Organization, National Representatives and International Staff. This agreement was signed in Ottawa, Canada, on September 29, 1951, and is referred to herein as the Ottawa Agreement. 5

U.S.T. 1087, T.I.A.S. 2992. Part IV of the Ottawa Agreement applies to officials of NATO's international staff. Article 17 therein provides that such officials will be agreed upon by the Chairman of the Council of Deputies and the member state concerned. Article 19 provides:

Officials * * * [so agreed upon] shall be exempt from taxation on the salaries and emoluments paid to them by * * * [NATO] in their capacity as such officials. Any Member State may, however, conclude an arrangement with the Council acting on behalf of * * * [NATO] whereby such Member State will employ and assign to * * * [NATO] all of its nationals (except, if such Member State so desires, any not ordinarily resident within its territory) who are to serve on the international staff of * * * [NATO] and pay the salaries and emoluments of such persons from its own funds at a scale fixed by it. The salaries and emoluments so paid may be taxed by such Member State but shall be exempt from taxation by any other Member State. * * * [5 U.S.T. at 1098.]

Article 22 of the Ottawa Agreement states that the privileges and immunities provided to such officials were so granted in the interests of NATO and not for the personal benefit of the individuals themselves.

The United States and the Council also concluded an arrangement in London, England, on September 29, 1951 (London Agreement), as allowed by the second sentence of Article 19 of the Ottawa Agreement. 5 U.S.T. at 1112. The London Agreement essentially provides:

A. Whenever NATO desires the services of a U.S. national, it will notify the deputy U.S. Council Representative of the nature of the position to be filled, the qualifications required, and the salary such individual would receive if employed by NATO;

B. the Government of the United States may assign to NATO a U.S. national from its Government service who is acceptable to

NATO, and the U.S. Government will provide security clearances for the individual concerned;

    C.   the Government of the United States will pay any and all salaries and emoluments of U.S. nationals, who are employed by it and assigned to NATO, from its own funds at rates determined by the U.S. Government;

    D.   NATO agrees that it will not pay salaries and emoluments to any citizen of the United States; and

    E.   NATO will credit to the United States the amounts of salaries and emoluments which would otherwise have been paid by NATO to U.S. nationals and will deduct the total of such credits for each fiscal year from the amount assessed the Government of the United States by NATO, in respect of the annual contribution of the United States Government for the subsequent fiscal year.

2.   <u>Federal Employees International Organization Service Act</u>

    The U.S. Senate deemed it appropriate and advantageous for the United States to take an active interest in the number and caliber of Americans serving with international organizations. It was determined that the increasing difficulties such organizations were experiencing in recruiting American specialists were due principally to the following:  (1) Reduced salary scales; (2) a lack of protection of Federal employment rights and benefits; and (3) a lack of authority to detail Federal employees to international organizations.  The appointment of Federal personnel to international organizations was deemed to have the advantage of providing a means of increasing the experience of Government employees.  To remedy recruitment difficulties, the Senate proposed legislation (S.4004) providing Federal agency heads with the authority to

detail employees to international organizations, and protecting the Federal employment rights of such employees.

On August 28, 1958, Congress enacted the Federal Employees International Organization Service Act (FEIOSA), Pub. L. 85-795, 72 Stat. 959, to encourage and authorize details and transfers of Federal employees for service with international organizations. This act is now codified at 5 U.S.C. secs. 3343, 3581-3584 (1994). Section 3584 of Title 5 provided the President with the authorization to prescribe regulations necessary to carry out the provisions governing the detail and transfer of employees to international organizations. In 1970, the President delegated to the Office of Personnel Management (OPM) the authority granted him by 5 U.S.C. sec. 3584.

3. Details and Transfers to International Organizations

Section 3343 of Title 5 addresses details, and 5 U.S.C. secs. 3581-3584 address transfers to international organizations. An international organization is defined as a public international organization in which the Government of the United States participates. An agency may detail or transfer an employee without prior approval of OPM if an organization is already designated as a qualifying international organization. NATO is listed as one such qualifying international organization.

a. <u>Details</u>

A detail is defined as the assignment or loan of an employee to an international organization without a change of position from the agency by which he is employed. 5 U.S.C. sec. 3343(a)(2). The status of an employee detailed to an international organization remains that of an employee of his agency for all purposes. A detailed employee is deemed an employee of the agency from which detailed for the purpose of preserving his allowances, privileges, rights, seniority, and other benefits, and he is entitled to pay, allowances, and benefits from funds available to that agency. 5 U.S.C. sec. 3343(c) and (d). A detailed employee continues to earn leave under his agency's system. The head of an agency may detail an employee from his agency to an international organization that requests services. 5 U.S.C. sec. 3343(b). Details may be made with or without reimbursement by the international organization to the United States. 5 U.S.C. sec. 3343(d).

b. <u>Transfers</u>

A transfer is defined as a change of position by an employee from an agency to an international organization. 5 U.S.C. sec. 3581(4).

An employee who transfers to an international organization is entitled to retain coverage, rights, and benefits under any system established by law for the retirement of employees of the United States; to continue to participate in the Federal

Employees Group Life Insurance Program under chapter 87 of Title 5 U.S.C.; and to continue enrollment in the Federal Employees Health Benefits Program under chapter 89 of Title 5 U.S.C. 5 U.S.C. sec. 3582(a)(1) and (2). To retain the above coverage, rights, and benefits during a period of transfer, all necessary employee payments and agency contributions must be currently deposited in the respective trust funds for these programs. 5 U.S.C. sec. 3582(a)(1) and (2). The agency must continue its contributions so long as employee payments are made. 5 U.S.C. sec. 3582(a)(1) and (2), (d). Consequently, a transferred employee who makes such contributions and retains such coverage, rights, and benefits remains an employee of the agency from which transferred <u>for retirement, health benefits, and group life insurance purposes</u>. 5 C.F.R. sec. 352.309(b) (1995). The period during which such coverage is retained is deemed creditable service under any retirement system and service as an employee for health and life insurance purposes. 5 U.S.C. sec. 3582(a)(1) and (2).

A transferee is also entitled to retain coverage, rights, and benefits for work-related injuries pursuant to chapter 81 (subchapter I) of Title 5 U.S.C. For this purpose, a transferee's employment with an international organization is deemed employment by the United States. However, any payments made by an international organization due to injury or death are

creditable against any benefits payable under subchapter I of chapter 81 of Title 5.  5 U.S.C. sec. 3582(a)(3).

At the time of transfer, a transferee may elect to retain all accumulations and accruals of annual leave to his credit which would otherwise be liquidated by a lump-sum payment.  A transferee may also request payment of all retained leave at any time prior to reemployment; however, if a transferee elects a lump-sum payment and is reemployed within 6 months of a transfer, such transferee must refund the lump-sum payment to the agency. 5 U.S.C. sec. 3582(a)(4).

A transferee has an absolute right to reemployment with the agency from which he was transferred, at his former position or a position of like seniority, status, and pay, within 30 days of application if he meets two conditions.  The transferee must separate from the international organization within his term of employment with the international organization, that is, within the agreed-upon time and any extensions thereof, and the transferee must make such application to his former agency no later than 90 days after separation.  If application is made 30 days or more prior to separation, such applicant is entitled to reemployment upon separation.  5 U.S.C. sec. 3582(b); 5 C.F.R. sec. 352.311-312.

Upon reemployment, a transferee is entitled to the same rate of pay to which he would have been entitled had he continuously remained in Federal Civil Service.  5 U.S.C. sec. 3582(b).  Also,

a transferee's sick leave account will be restored to its status at the time of transfer.  5 U.S.C. sec. 3582(b).  Additionally, the period of separation caused by a transfer to an international organization, as well as the period necessary to effectuate reemployment, is deemed creditable service for all appropriate Civil Service purposes.  For example, the service is counted for retirement purposes if a transferee retains retirement coverage. 5 U.S.C. sec. 3582(b).

An employee may be detailed or transferred pursuant to a written request by an international organization for the services of a U.S. employee only upon the consent and at the discretion of the head of a U.S. agency.  An agency may authorize the detail or transfer of an employee to the organization for a period not to exceed 5 years.  The period of employment may be extended for an additional 3 years with the consent of the head of the agency, only when the Secretary of State determines such extension to be in the national interest.  5 U.S.C. secs. 3343, 3582(a); 5 C.F.R. sec. 352.308.

Refusal to authorize a transfer or an extension to transfer is not reviewable or appealable.  An agency and an international organization shall by mutual agreement establish the effective date of detail or transfer.  5 C.F.R. sec. 352.308.  Upon separation, an agency shall furnish a transferee with a statement of his leave account and shall include on the personnel action form effecting the employee's separation for transfer:  (1) The

identity of the international organization to which he transfers; and (2) a clear statement of the period during which he retains reemployment rights in the agency. Id.

4. NATO Vacancy

On August 20, 1985, NATO posted a notice that a position on its international staff would become vacant in May 1986. Secretaries of Delegations were invited to submit names of qualified candidates. The notice stated that the successful candidate would be offered a definite duration contract not exceeding 3 years, but that such term could be renewed by mutual consent for an additional 3 years. The record herein does not include such a contract. At the time petitioner applied for the post advertised, he was in the U.S. Department of the Army (DOA), as a program analyst in the Office of the Comptroller of the Department of Defense (DOD) of the U.S. Government. Petitioner was interviewed by NATO personnel at NATO headquarters in Brussels, Belgium, sometime in March 1986. NATO paid all expenses relating to petitioner's interview.

By letter dated March 25, 1986, NATO's Deputy Director of Management informed the Administrative Adviser of the U.S. Mission to NATO that the Secretary General of NATO had decided to appoint petitioner, subject to a valid security clearance, to the grade A.4 post of senior statistician. This letter also inquired whether petitioner should be recruited on a reimbursable or direct hire basis. In April, the U.S. Mission to NATO notified

the U.S. Secretary of Defense of petitioner's proposed appointment. The notification requested the Defense Secretary to: (1) Confirm petitioner's acceptance of the offer; (2) provide an estimated reporting date; (3) certify petitioner's security clearance status and the date of his last background investigation; and (4) confirm whether petitioner's appointment would be on a reimbursable basis.

5. NATO's International Staff Position

As a result of his interview, petitioner was offered the NATO position. He accepted the offer. Upon acceptance, a Form 50-B, Notification of Personnel Action, was prepared by the DOA, reflecting petitioner's transfer from his position with the DOD to his new position with NATO for a 3-year term, effective June 22, 1986. While the United States initially paid the expenses of moving petitioner and his family to Belgium, NATO reimbursed the United States for these costs.

At the time NATO extended the offer, it was explained to petitioner that because he was a U.S. Government employee, he had the option of being recruited on a "reimbursable" or a "direct hire" basis. Petitioner was notified that if he elected to be recruited on a direct hire basis, he would lose his Civil Service retirement and other benefits, as well as any right to be reemployed by the United States following his term with NATO. Petitioner would receive his salary, emoluments, and other employment benefits directly from NATO, at the NATO salary scale

applicable to his position. If, instead, petitioner chose to be recruited on a reimbursable basis, he would receive his salary and emoluments directly from the DOA at the salary level applicable to his former grade as a U.S. employee (GS-14), would be granted reemployment rights with the U.S. Government for a limited period following his employment under the NATO appointment, and would continue to be eligible to participate in employee benefit programs. Under the reimbursable option, NATO would provide the United States with a credit against its fiscal assessment for the amount of salary and emoluments that would otherwise have been paid by NATO to petitioner pursuant to NATO's salary scale. Petitioner would continue to be considered for every promotion he would have been considered for had he remained with the DOA, and if his former position was upgraded during his absence, he would be upgraded as if he were still in that position. Even in the reimbursable status, however, petitioner would be entitled to certain educational allowances provided and paid to him directly by NATO in accordance with NATO policy and regulations.

Petitioner elected to be recruited on the "reimbursable" basis and was transferred to NATO's international staff in accordance with the London Agreement. Accordingly, as a then employee of the U.S. Government who was transferred to an international organization (NATO), petitioner was entitled to, and did continue to participate in the U.S. Civil Service

Retirement System health and life insurance programs available to U.S. employees, and was granted the right to be reemployed by the United States following his tenure with NATO.

During the years in issue, petitioner was paid on a monthly basis from the U.S. DOA in the United States for the services he performed for NATO on its international staff. Forms W-2, Wage and Tax Statements, were issued to petitioner by the DOA for each of the years in issue. While the general salary level was determined by NATO, the specific amount of petitioner's salary was determined and paid in accordance with the internal salary schedule of the U.S. Government. Although the NATO salary level of a senior statistician, Systems Analysis and Statistics Service, Defense Planning and Policy Division, was a grade A-4, petitioner was paid under the U.S. salary level as a GS-14.

Before beginning work with NATO in June 1986, pursuant to NATO's regulations, petitioner was required to sign a "Declaration On Accepting Appointment", which provided:

> I solemnly undertake to exercise in all loyalty, discretion and conscience the functions entrusted to me as a member of the staff of NATO, and to discharge these functions with the interests of NATO only in view. I undertake not to seek or accept instructions in regard to the performance of my duties from any government or from any authority other than the Organization.

Petitioner was required to devote substantially full time to his duties on the international staff. He was required to render services to NATO personally and performed services solely for

NATO during his term of transfer.  A continuing relationship existed between petitioner and NATO during the years in issue.

NATO authorities dictated the results that petitioner was to accomplish through his work, as well as the means by which he was to attain those results.  NATO retained the right to control the order and sequence of the tasks that petitioner performed.  NATO's personnel regulations set forth various details concerning employment, including work hours, holidays, and rights concerning leave.

NATO's personnel regulations required the organization to provide insurance coverage to appropriately compensate staff members and their families for physical injuries suffered as a result of the performance of NATO duties.  As an international staff member, petitioner was also entitled to, and did receive, certain educational allowances that were paid directly by NATO.  The stipulated record in this case does not reveal the exact amounts paid to him.

A staff member could be separated from NATO due to the expiration of the term of contract, resignation by the member, age limitation, death, dismissal, or termination by the head of a NATO body.  Termination could result if a staff member did not perform satisfactorily; became incapacitated; if the country from which he were a national ceased to be a member of NATO, or withdrew or failed to renew a security clearance; or due to disciplinary action.

Petitioner's initial term with NATO was for 3 years beginning June 22, 1986, and ending June 21, 1989. Petitioner was required to obtain approval from appropriate U.S. authorities for any and all extensions of his NATO tour. Petitioner's initial term was extended by U.S. authorities, and twice by the Secretary General of NATO, through June 21, 1994. In order to continue his reemployment rights with the U.S. Government, petitioner was required to obtain an extension of such rights. Petitioner was granted extensions of his rights to reemployment.

6. Petitioners' Tax Returns

For the years 1988, 1989, and 1990, petitioner reported gross income of $110,465.59, $83,290.72, and $73,457.92, respectively. He received compensation for services performed for NATO from the DOA totaling $67,625.10, $67,625.36 and $70,082.76, respectively. These amounts were reflected in petitioners' tax returns, including Form 2555, Foreign Earned Income. Additionally, in part III of Form 2555, petitioner reported as part of his foreign earned income, total allowances, reimbursements, and other expenses paid on his behalf totaling $28,960.49, $3,616, and $8,545.45, respectively, for the years 1988, 1989, and 1990. Petitioner reported these allowances inconsistently during the years in issue. The significant decrease in amounts reported between the years 1988 on the one hand, and 1989 and 1990 on the other hand, is attributable to the fact that petitioner in 1989 and 1990 did not include the total

allowances he received as part of the total foreign earned income reflected on the form. Petitioner included a total figure for the allowances he received in 1989 and 1990 in the space beside the description for such allowances and described some allowances as tax exempt; therefore, he did not include these amounts as part of the total foreign earned income. Petitioner reflected the home leave allowance as taxable in the only year it was received. He reported the NATO education allowances as tax-exempt in 1 year and as part of his foreign earned income in 2 other years. Petitioner consistently determined that the costs of living, overseas differential, and the quarters allowances were foreign earned income for all 3 years. Consequently, petitioner reported foreign earned income for the years 1988, 1989, and 1990 totaling $96,585.59, $71,241.36, and $78,628.21, respectively, before applying the limitations of section 911(b)(2)(A). On his returns, petitioner claimed exclusions from income of $83,486.54, $65,100, and $70,000 for the years 1988, 1989, and 1990, respectively. For each year, petitioner consistently reported that his employer was the "NATO International Staff."

Respondent's notice of deficiency determined that petitioner was not entitled to the total amounts claimed as section 911 exclusions because the salary petitioner received from the DOA was not qualified foreign earned income.

7. <u>Section 911</u>

At the election of a qualified individual, section 911(a)(1) provides a limited exclusion for foreign earned income. Such exclusion is limited to $70,000 annually. Sec. 911(b)(2). A qualified individual is a U.S. citizen whose tax home is a foreign country and who meets the bona fide residence test, or resides in a foreign country for a qualifying period. Sec. 911(d)(1). The parties agree that petitioner was a U.S. citizen and was a qualifying individual during the years in issue. Foreign earned income includes amounts received from sources within a foreign country as earned income for services performed, but does not include amounts "paid by the United States or an agency thereof to an employee of the United States or an agency thereof". Sec. 911(b)(1)(A) and (B)(ii).

a. <u>Petitioner's Employment Status</u>

Respondent essentially contends that although petitioner was transferred to NATO in accordance with the hiring procedures of the London Agreement, he remained a U.S. employee for purposes of section 911, regardless of common law principles of employment; additionally, that amendments to section 911 made pursuant to the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, sec. 111(a), 95 Stat. 172, 190, do not alter this result.

Article 19 of the Ottawa Agreement allowed member states to conclude an arrangement with NATO whereby a member state would

hire its nationals, assign them to NATO's international staff, and pay their salaries from its own funds at a scale fixed by it. By entering into such an arrangement, a member state could still tax the amounts it so paid its nationals. The United States entered into such an arrangement (the London Agreement). We have determined that the United States retained the power to subject its nationals to its taxing jurisdiction by complying with the mechanism provided in Article 19. We have also found that Article 19 gave the United States the ability to tax U.S. nationals, rather than directly imposing the tax itself. Amaral v. Commissioner, 90 T.C. 802, 815-816 (1988).

Prior to 1981, the relevant language limiting section 911 excludability referred to amounts "paid by the United States or any agency thereof." In 1981, ERTA broadened the potential section 911 exclusion by narrowing the definition of amounts excluded from foreign earned income. Effective for taxable years beginning after December 31, 1981, ERTA changed "paid by the United States or an agency thereof" to "paid by the United States or an agency thereof to an employee of the United States or an agency thereof". ERTA sec. 111(a), 95 Stat. 190; Matthews v. Commissioner, 907 F.2d 1173 (D.C. Cir. 1990), affg. 92 T.C. 351 (1989).

Petitioner acknowledges that before the ERTA amendment, there would have been little doubt that he would not qualify for

the benefits of section 911.  By making this concession, petitioner agrees with respondent that he was "paid" by the United States or an agency thereof, thereby eliminating from consideration any question regarding who paid petitioner for the services he performed for NATO.  It is clear that before enactment of ERTA in 1981, the United States retained the power to tax its nationals by following the hiring procedures set forth in the London Agreement.  Amaral v. Commissioner, supra at 816.

Respondent argues that following the London Agreement procedures conclusively determines that petitioner is a U.S employee pursuant to section 911(b)(1)(B)(ii), as amended by ERTA, on the theory that the language "employ and assign" of the Ottawa Agreement is sufficient, in and of itself, to resolve the employment question without consideration of the facts and circumstances involved herein.  Article 19 of that agreement contemplates that member states which hire and pay their nationals may "assign or detail" those persons for duty with NATO.  Such persons are considered "seconded" to NATO.  Amaral v. Commissioner, supra at 806.  Respondent contends that both detailed and transferred employees are "seconded" from the United States and that, therefore, both are assigned to NATO and both are U.S. employees, taxable on the salaries they receive from the United States.  While the term "detail" is defined as the "assignment or loan" of an employee to an international

organization, a transfer is defined as a change of position by an employee from a U.S. agency to an international organization. 5 U.S.C. secs. 3343(a)(2), 3581(4). It is evident that petitioner was required to be an employee of the U.S. Government in order to apply for the NATO position; whether he remained a U.S. employee while performing services for NATO throughout the years in issue is a threshold issue we are called upon to decide.

We cannot ignore that ERTA modified the relevant language of section 911, while the language of the Ottawa and London Agreements has remained unchanged. Although the United States retained the power to tax its nationals by following the London hiring procedures, ERTA added a change to the tax law that has not caused a change in the Ottawa or London Agreements. Congress can abrogate a treaty provision by subsequent statute. Reid v. Covert, 354 U.S. 1, 18 (1957). It is equally true, however, that when a treaty and a statute relate to the same subject, courts will always attempt to construe them so as to give effect to both. Whitney v. Robertson, 124 U.S. 190, 194 (1888). The intention to abrogate or modify a treaty is not to be lightly imputed to Congress. Menominee Tribe v. United States, 391 U.S. 404, 413 (1968). We agree with petitioner that respondent fails to distinguish between Congress' power to tax and its exercise of that power. The Ottawa and London Agreements are construed as contracts, one among nations and the other

between the United States and an international organization.
Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243,
253 (1984); Sullivan v. Kidd, 254 U.S. 433, 439 (1921).  They are
not laws by which a nation imposes a tax on its citizens.

An examination of existing law and the facts herein is
required in light of the ERTA change.

The conference report accompanying ERTA states:

> The bill extends the benefits of the exclusion to
> individuals who receive compensation from the U.S. or any
> agency thereof, but who are not employees of the U.S. or any
> agency thereof.  Thus, for example, the bill extends the
> exclusion to certain overseas independent contractors and
> teachers at certain schools for U.S. dependents who are not
> employees of the U.S. or any agency thereof.  [H. Rept. 97–
> 215 (1981), 1981-2 C.B. 481, 486.]

Respondent argues that petitioner is not a member of the
protected class carved out by the ERTA amendment as he is not an
independent contractor.  Respondent further argues that as
petitioner is an employee, he is not an intended beneficiary of
the amendment and should not be eligible for the section 911
exclusion.  The conference explanation does not limit the
exclusion to independent contractors and teachers but merely
provides examples of beneficiaries of the legislation.  Although
the most obvious beneficiaries of the amendment may be
independent contractors, the language of the amendment speaks for
itself, and we cannot determine from the legislative history
alone that petitioner was not an intended beneficiary of the
amendment.  The legislation clearly extends the benefits of

section 911 to individuals who receive compensation from the United States but who are not employees of the U.S. Government.[1]

The Ways and Means Committee report accompanying ERTA explains the change further:

> The bill extends the benefits of the exclusion to individuals who are paid by the United States but who are not eligible for any exclusion under section 912 or any other provision of U.S. law. As a general rule, therefore, employees of the Federal Government will not be eligible for the exclusion. [H. Rept 97-201 (1981), 1981-2 C.B. 352, 355.]

It is respondent's position that petitioner was eligible for, and did receive, certain benefits from the U.S. Government, such as allowances, reimbursements and expenses for cost of living and overseas differentials, education expenses, and quarters and housing. Section 912 generally provides that amounts received by civilian officers and employees of the United States as foreign area, cost of living, and Peace Corps allowances are exempt from taxation. To be eligible for these benefits and this exclusion, a taxpayer must be a civilian officer or an employee of the U.S. Government, a determination we have yet to make. Consequently, an analysis of section 912 alone is not helpful in resolving the issue before us as it presupposes petitioner is a U.S. employee. As revealed by petitioners' tax

---

[1] Stated more precisely, the 1981 amendment to sec. 911 did not directly increase the exclusion from income therein; it may have done so indirectly by narrowing the limitation on that exclusion.

returns, petitioner did receive allowances. Contrary to respondent's assertions, receipt of these benefits by itself is not determinative of petitioner's status as a U.S. Government employee. Although petitioner may have received benefits of a type contemplated by section 912, this fact does not conclusively determine that petitioner is a U.S. employee, but merely indicates that someone thought he qualified for such benefits.

Neither in section 911 nor elsewhere does the Code contain definitions of "employee" or "U.S. employee". Respondent agrees that precedents adopt the common law test when defining "employee" for purposes of section 911(b)(1)(B)(ii). Matthews v. Commissioner, 907 F.2d at 1175. It is clear that absent indications to the contrary, courts have used the common law test for defining "employee" in tax cases. Id. at 1178. Courts have identified several factors to be considered when determining whether an employment relationship exists. Among them are: (1) The right to control the manner in which the work is performed; (2) whether the individual performing the work has an opportunity for profit or loss; (3) the furnishing of tools and the work place to the worker; (4) the permanency of the working relationship; (5) whether the service rendered is an integral part of the alleged employer's business; (6) whether services are offered to the general public rather than to one individual; (7) the right to discharge; and (8) the intent of the parties or the

relationship they think they are creating. <u>Juliard v. Commissioner</u>, T.C. Memo. 1991-230. The control factor overlaps many other factors and is often cited as the fundamental or "master" test of an employment relationship. <u>Matthews v. Commissioner</u>, 92 T.C. at 361. Having stipulated virtually every significant element of the common law test, it seems that respondent has largely conceded that petitioner was a common law employee of NATO during the years in issue. Although respondent states that it cannot be said that petitioner was clearly an employee of NATO, an examination of the facts and applicable law demonstrates otherwise.

Respondent asserts that NATO had no authority to hire petitioner but instead had to seek petitioner's transfer from the U.S. Government. The London and Ottawa Agreements and the U.S. Code and the Code of Federal Regulations, as well as the manner by which petitioner was transferred to NATO, reveal that the transfer process was a joint endeavor whereby both NATO and the U.S. Government, respectively, agreed to acceptable hires and transferees. The effective date of transfer was likewise mutually agreed upon. NATO notified the U.S. Government of a vacancy, the nature of the position, qualifications required, and the salary, if employed by NATO. We agree that potential NATO hirees could be accepted only upon the consent and at the

discretion of the head of a U.S. agency, as well as the Secretary General of NATO.

Requests for extensions of tour with NATO were subject to U.S concurrence, but contrary to respondent's contentions, there is no authority for the proposition that the United States could require petitioner's return or terminate petitioner's tour before expiration of an agreed-upon term. Respondent seeks support for her contention in language contained in a standard form entitled Rotation Agreement--Employees Recruited From The United States, stating that extensions beyond the initial tour will be authorized should management decide that an extension would be in the best interests of the DOA. This form further states that denial of such extension was not contestable. These statements are consistent with U.S. law. To retain reemployment rights, a transferee must separate from an international organization within his agreed term of employment and any agreed extensions thereof. We find that the United States retained the right to deny a request for an extension of an agreed term, but could not require a transferee to return before his agreed term expired. Further, should a transferee choose to remain beyond his tour without U.S. approval, he would forfeit any right to reemployment.

NATO's rights of termination were markedly broader than the rights of the United States. Significantly, NATO could terminate

petitioner not only upon the expiration of his term, but also due to disciplinary action, unsatisfactory performance, or if the country from which he was a national ceased to be a NATO member, withdrew, or failed to renew a security clearance.

While respondent argues that petitioner and the United States intended to continue their employment relationship throughout petitioner's tenure with NATO, such intent is not clear under the facts herein.  We do find that the United States sought not only to encourage transfers, but also sought to encourage the reemployment of transferees upon the expiration of their term of transfer.  Congress enacted FEIOSA for the purpose of encouraging details and transfers to international organizations in which the United States participates.  Houchens v. Office of Personnel Management, 939 F.2d 970, 971 (Fed. Cir. 1991).  Increasing the number and caliber of U.S. employees serving in these international organizations was considered to be of benefit to the United States as such individuals would gain valuable international expertise which could be employed to increase the effectiveness of the participation of the United States in these international organizations.  Congress sought to encourage such transfers by eliminating deterrents.  Transferees were provided with the ability to protect their employment benefits and the right to reemployment upon the expiration of a term of transfer.

Respondent argues that petitioner's election to be paid pursuant to the reimbursable option instead of as a direct hire reflects his intent to continue his employment relationship with the United States.  The legislation outlined herein specifically contemplates that transferees could retain such rights and benefits and further specifies that one of the deterrents to such transfers was the prospect of reduced salary scales upon transfer.  We note that the London Agreement provided that the U.S. Government was to pay its nationals assigned to NATO at rates determined by the former.

NATO, during petitioner's term of transfer, exclusively directed petitioner's daily activities including the sequence of tasks, the desired results to be achieved, and the means by which such results were to be obtained.  Petitioner was accountable solely to NATO.  This is revealed not only by NATO's personnel regulations but also by the loyalty declaration petitioner signed upon accepting his appointment to NATO.

Respondent argues that even though petitioner may be an employee of NATO pursuant to the common law test, petitioner also remained an employee of the United States for purposes of section 911, by virtue of the benefits and rights he retained as a transferred employee.

Respondent suggests that the common law test for "employee" should be construed broadly so as to consider the significant

benefits retained by petitioner.  Petitioner argues that his retention of benefits is not conclusive as to the identity of his employer.  We agree with petitioner.  The determination of whether petitioner was an employee of the United States depends on all the facts and circumstances, including the paramount fact that NATO, rather than the United States, controlled the manner in which his work was performed.  Matthews v. Commissioner, 92 T.C. at 360.

Other facts also indicate that petitioner was separated from U.S. Government service during his transfer to NATO.  Unlike a detail, a transfer was considered a change in position.  Additionally, a transferee's right to reemployment with the United States, in and of itself, indicates that a transferred employee was no longer considered a U.S. employee.  Although a transferee retained an absolute right to reemployment, he had to affirmatively apply for such reemployment.  Upon transfer, transferees were entitled to liquidate their accumulated leave accounts in the same manner as separated employees.  If a transferee chose to retain retirement health and life insurance coverage, the transferee was considered a U.S. employee for these limited purposes.  While on transfer to an international organization, transferees were also considered employed by the United States for purposes of workman's compensation coverage. It can be inferred from these provisions that transferees were

not considered U.S. employees for other purposes.  Cf. Matthews v. Commissioner, supra.

Petitioner's performance was regularly evaluated by his NATO supervisors.  We do not find such arrangement to be contrary to a transferee's status as a separated employee.

In sum, we find that in the years in issue, petitioner was an employee of NATO, and not of the United States or an agency thereof.

b.  Petitioner's Income Under Section 911

We have decided that petitioner in the years in question was the employee of NATO and not of the United States.  This means that the restrictions of section 911(b)(1)(B)(ii) do not apply to petitioner here because although he was paid by the United States, as the parties have stipulated, he was not an employee of the United States.  This does not mean that the exemption from income under section 911 was broadened by the 1981 amendment to section 911, but rather that the exclusion from that exemption from income was somewhat narrowed, so that before the benefits of section 911 could be denied the employee, it had to be shown that he was both paid by the United States and at that time was also an employee of the United States.  Since we have found that petitioner was not an employee of the United States, the restriction on his right to claim section 911 benefits is removed.

The parties have agreed and stipulated:

> If Mr. Adair was not, during the taxable years at issue, "an employee of the United States" within the meaning of I.R.C. section 911(b)(1)(B)(ii), the compensation he received for his work for NATO during those years was "foreign earned income", as that term is defined in I.R.C. section 911(b)(1)(A).

We treat this stipulation by the parties as a concession by respondent that since we have found that petitioner was not an employee of the United States, his compensation, both pay and allowances, as a member of NATO, are entitled to exemption from United States income tax under section 911(a)(1), cf. Walker v. Commissioner, 101 T.C. 537, 550 (1993), subject, of course, to the other applicable restrictions of section 911, including the dollar limitations on foreign earned income in section 911(b)(2) for the years in question.  Although petitioners claimed an exclusion from income for the year 1988 on account of housing, presumably under section 911(a)(2), and although respondent's statutory notice of deficiency disallowed this claimed exclusion as well as the claimed exclusion for salary under section 911(a)(1), petitioners did not allege error on respondent's part because of the disallowance of this housing exclusion, and alleged no facts or argument, either in their petition or on brief, in support of the proposition that such housing exclusion for 1988 should be allowed.  We conclude that petitioners have abandoned the issue.

Accordingly, since the only issue presented in this case was the right of petitioner to take advantage of the foreign earned income exclusion of section 911(a)(1) because of his compensation for serving as a member of NATO, and since respondent has conceded that issue if we decide, as we have, that petitioner was an employee of NATO and not of the United States, a recomputation of petitioners' tax liability for the years 1988, 1989, and 1990 will be necessary, and

<u>Decision will be entered</u>

<u>under Rule 155</u>.