T.C. Memo. 2015-248

UNITED STATES TAX COURT

SAMUEL STRIKER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27884-13.                    Filed December 28, 2015.

<u>Thomas A. Klug</u>, for petitioner.

<u>Robert D. Heitmeyer</u>, for respondent.

MEMORANDUM OPINION

LAUBER, <u>Judge</u>:  The Internal Revenue Service (IRS or respondent) deter-mined, for 2010 and 2011, respectively, deficiencies in petitioner's Federal income tax of $24,937 and $26,636 and accuracy-related penalties of $4,987 and $5,327.  The parties filed a stipulation of settled issues by which respondent con-ceded the penalties.  The sole remaining question for decision is whether petitioner

[*2] is entitled to exclude from gross income, as "foreign earned income" under section 911(a), the wages he earned while deployed to the North Atlantic Treaty Organization (NATO) mission in Afghanistan.[1]  Because we find that petitioner was an employee of the United States when performing these services, we hold that section 911(b)(1)(B)(ii) prevents his compensation from being characterized as "foreign earned income."

Background

This case was submitted fully stipulated under Rule 122.  The stipulated facts and exhibits are incorporated by this reference.  Petitioner resided in Michigan when he petitioned this Court.

Petitioner, a U.S. citizen, is a social scientist with a Ph.D. in his field.  During 2010 and 2011 he performed services as a civilian during two deployments to Afghanistan.  The first deployment ran from October 2009 to November 2010, the second from November 2010 to October 2011.  During both deployments he served in units led by NATO commanders.

---

[1]Unless stated otherwise, all statutory references are to the Internal Revenue Code as in effect for the taxable years in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*3] NATO currently has 48 members, including the United States. NATO is funded by direct and indirect contributions from its members. Direct contributions cover the expenses of NATO command structures, alliance-wide communications systems, NATO-wide air defense, and similar fixed costs. Members contribute to NATO indirectly by participating in NATO-led missions and operations. Whenever a member country volunteers military forces or civilian consultants to perform in a NATO-led operation, that member country typically pays the costs of deploying its personnel.

NATO conducted its mission in Afghanistan through a body known as the International Security Assistance Force (ISAF). The NATO-ISAF mission was part of an overall effort by the international community mandated by the United Nations Security Council. The objective of this mission was to enable the Afghan Government to provide effective security across the country and thus combat terrorism. NATO-ISAF divided Afghanistan into five distinct regional commands and assigned one or more member countries to supervise each regional command.

Petitioner wished to employ his social science skills to assist the NATO mission in Iraq or Afghanistan. He accordingly applied to the U.S. Department of the Army (Army), a military department within the Department of Defense (DoD), with the goal of obtaining a position that would enable him to participate in one of

**[*4]** these coalition efforts. The Army accepted petitioner for deployment and subsequently assigned him to a NATO post in Afghanistan.

After he was accepted by the Army, petitioner went to Fort Leavenworth, Kansas, to receive training, security clearances, and travel orders. His travel authorization was set forth on a standard form used for DoD personnel. This document states that petitioner's "permanent duty station" was Fort Leavenworth, Kansas, and that the purpose of his travel was "special mission deployment." It lists his "organizational element" as "TRADOC G2 TRISA." TRADOC is the acronym for the U.S. Army Training and Doctrine Command; G2 denotes the Army's Intelligence Division; and TRISA denotes the Intelligence Support Activity for TRADOC.

The Army decided where petitioner was to be deployed and specified the dates, times, and other terms of his departures to and from Afghanistan. Petitioner's travel orders state that he was to fly from Fort Leavenworth to Fort Benning, Georgia; to fly from Fort Benning to "military bases not in Kabul, Afghanistan"; and to return to Fort Leavenworth. When petitioner arrived in Fort Leavenworth, he did not know where he was ultimately going or what his assignment would be. When his flight left Fort Benning, he likewise did not know where he would be assigned or what his specific mission would be.

**[*5]**   Petitioner arrived at Bagram Airfield, the largest U.S. military base in Afghanistan, in October 2009.  The Army then assigned him to the NATO-ISAF Regional Command (South), where he was stationed at Kandahar Airfield.  A Canadian general was the NATO base commander for this region.

Petitioner's mission as a social science expert was to act as a liaison between the NATO command and the local people of Kandahar and its surrounding area.  He sought to help military officers gain a better cultural understanding of this population.  He also gathered and analyzed information concerning local commerce (including illicit commerce) with the aim of helping NATO create a successful local security apparatus.  Petitioner regularly participated in NATO-sponsored training and workshops, some of which were mandatory.

Petitioner wore a NATO-ISAF civilian name tag and a NATO badge when rendering these services, which he performed as part of a Human Terrain Team (HTT).  The HTT was composed of citizens from various NATO countries, and the team's composition changed as personnel came and went.  Each HTT had a team leader whose main role was to ensure that requests for information from NATO military officers were properly addressed.  The team leader conducted petitioner's performance evaluations but had no authority to discipline him or discharge him from his post.

**[*6]**   The NATO base commander exercised ultimate operational control over petitioner's mission.  While the base commander could not terminate petitioner from his position with the Army, he could refuse petitioner access to the base in Kandahar.  This would have the effect of removing petitioner from the regional command and rendering him unable thenceforth to perform the mission to which the Army had assigned him.  If this were to happen, petitioner would be required to fly back to Fort Leavenworth and either apply for another deployment with the Army or return home.

Upon the conclusion of his first deployment, petitioner returned to Fort Leavenworth.  The Army then accepted him for a second deployment, which began in November 2010.  As was true for his first deployment, petitioner did not know what his exact mission or assignment would be when he left the United States.  This time the Army assigned him to the NATO-ISAF Joint Command and stationed him at a NATO military facility near Kabul.

The terms and conditions of petitioner's first and second deployments were similar in all material respects.  He again served as a member of an HTT and supplied military commanders with a cultural understanding of the local population.  He addressed questions concerning the Afghan army's attrition rate, village assessments, and the analysis of night raid casualties.

[*7]   During both deployments petitioner received formal and informal evaluations of his work from his HTT team leader.  The formal evaluations, conducted pursuant to the Defense Civilian Intelligence Personnel System (DCIPS), were required by DoD for all intelligence personnel.  The Army directed the HTT team leaders to conduct these evaluations.  While a team leader of any nationality could have performed the evaluations, both of the team leaders who performed petitioner's DCIPS evaluations were U.S. citizens and members of the U.S. armed forces.

The record includes a DCIPS evaluation of petitioner for his second deployment.  It is 12 pages long and rates his overall performance as "outstanding."  The rating official who signed this evaluation was a colonel in the U.S. Army.  The reviewing official who reviewed this evaluation was a likewise a U.S. Army officer and was part of TRADOC, the same "organizational element" to which petitioner belonged.

The Army paid petitioner on the basis of standard U.S. Government pay scales.  He had a GS-13 grade during his first deployment and a GS-14 grade during his second.  The Army provided him with standard DoD fringe benefits, including health and retirement benefits.  The Army furnished him with a bi-weekly "Civilian Leave and Earnings Statement" showing his gross pay and deductions.  The Army reported petitioner's wages to the IRS on Forms W-2, Wage

[*8] and Tax Statement, and withheld from his paychecks the required Federal income and employment taxes.

Petitioner filed Federal income tax returns on Forms 1040, U.S. Individual Income Tax Return, for 2010 and 2011. Petitioner did not maintain a permanent residence in the United States during these years and listed his mother's residence as his address on these returns. Both returns were prepared by a qualified income tax return preparer.

Petitioner attached to his returns Forms 2555, Foreign Earned Income, on which he claimed under section 911 exclusions of $91,500 and $92,900 for 2010 and 2011, respectively. (His actual wages for performing services in Afghanistan were higher; the exclusions he claimed represented the maximum amounts allowed for each year.) On the Forms 2555 petitioner listed his occupation as "Defense Contractor"; listed his employer as "Defense Finance & Accounting Services"; stated that his employer was a "U.S. company"; listed his employer's U.S. address as a location in Cleveland, Ohio; and listed his employer's foreign address as a location in Kabul, Afghanistan.

The IRS examined petitioner's 2010 and 2011 returns and disallowed the foreign earned income exclusions on the ground that he was, during both deployments, an employee of the U.S. Government. As a corollary of these adjustments,

**[*9]** the IRS made computational adjustments to petitioner's itemized deductions and alternative minimum tax. The IRS on August 29, 2013, issued petitioner a timely notice of deficiency, and he timely petitioned this Court.

Discussion

I.    Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). That this case was submitted fully stipulated changes neither the burden of proof nor the effect of a failure of proof. Rule 122(b); Borchers v. Commissioner, 95 T.C. 82, 91 (1990), aff'd, 943 F.2d 22 (8th Cir. 1991). Although facts may be established by stipulation, a stipulation of facts does not relieve the party bearing the burden of proof from producing evidence to support factual findings not adequately established by the stipulation. Rule 149(b). Failure to produce evidence in support of an issue of fact may be a ground for resolving that issue against that party. Ibid.

II.   Foreign Earned Income Exclusion

Section 61(a) provides that gross income means "all income from whatever source derived." Citizens of the United States are taxed on their worldwide income unless a specific exclusion applies. Eram v. Commissioner, T.C. Memo.

**[\*10]** 2014-60, at \*10.  Exclusions from gross income are construed narrowly, and a taxpayer must clearly establish his entitlement to any such exclusion.  Ibid.

Section 911(a) provides that a "qualified individual" may elect to exclude from gross income, subject to limitations set forth in subsection (b)(2), his or her "foreign earned income."  To be entitled to this exclusion, a taxpayer must satisfy two distinct requirements.  First, he must be an individual "whose tax home is in a foreign country."  Sec. 911(d)(1).  Second, he must either be a "bona fide resident" of one or more foreign countries or be physically present in such countries during at least 330 days in a 12-month period.  Ibid.  Respondent agrees that petitioner meets these general requirements.

Section 911(b)(1)(B)(ii) excludes from foreign earned income amounts "paid by the United States or an agency thereof to an employee of the United States or an agency thereof."  Whether petitioner is entitled to the foreign earned income exclusion thus turns on whether he was employed by the United States during 2010 and 2011.

Whether a taxpayer is an "employee" is a question of fact.  Matthews v. Commissioner, 92 T.C. 351, 360 (1989), aff'd, 907 F.2d 1173 (D.C. Cir. 1990); Professional & Exec. Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), aff'd, 862 F.2d 751 (9th Cir. 1988).  In determining whether a person is an "em-

**[\*11]** ployee" of the United States within the meaning of section 911(b)(1)(B)(ii), we "look to the common law to determine the relationship." Matthews, 92 T.C. at 360. "In determining the existence of a common law employer-employee relationship, 'the crucial test lies in the right of control, or lack of it, which the employer may exercise respecting the manner in which the service is to be performed.'" Id. at 361 (quoting Reed v. Commissioner, 13 B.T.A. 513 (1928), rev'd and remanded, 34 F.2d 263 (3d Cir. 1929), rev'd per curiam, 281 U.S. 699 (1930)).

The facts of this case closely resemble those in Gillis v. Commissioner, T.C. Memo. 1986-576, 52 T.C.M. (CCH) 1128. The taxpayer there was a lieutenant colonel in the U.S. Air Force who "was assigned to NATO * * * in Germany and worked under the supervision of a German general." Ibid. The Air Force paid his salary. Id. at 1129. The taxpayer nevertheless contended that "he was employed by NATO and the source of his payments was NATO." Ibid.

We rejected the taxpayer's argument and held that his wages were not excludable under section 911(a). We reasoned as follows:

> Petitioner did not show that he had a separate contract with NATO.
> He was assigned to NATO by the Air Force. NATO did not have the
> authority to hire petitioner or to fire him from the Air Force. Further-
> more, petitioner's paycheck was made out by the Air Force rather
> than NATO. Therefore, even if petitioner could prove that NATO
> was the original source of the funds used to pay his salary, he was

**[*12]**  controlled and paid directly by the Air Force.  [Gillis, 52 T.C.M. (CCH) at 1129.]

In short, even though the taxpayer in Gillis was subject to the day-to-day supervision of a German NATO commander, we concluded that he was "controlled * * * by the Air Force" because the Air Force hired him, paid his salary, assigned him to the NATO post, and had the exclusive authority to discharge him from military service.  Ibid.

The purpose of the section 911(b)(1)(B)(ii) exception is to "prevent a windfall to United States government employees in foreign countries."  Smith v. Commissioner, 701 F.2d 807, 809 (9th Cir. 1983), aff'g 77 T.C. 1181 (1981).  We concluded in Gillis, 52 T.C.M. (CCH) at 1129, that the taxpayer "should not be allowed a windfall merely because he is stationed overseas in an allied command."  We found no evidence that a taxpayer whom the U.S. military has assigned to a NATO command "should be treated any differently from any other military personnel serving overseas."  Ibid.

We reached a different conclusion in Adair v. Commissioner, T.C. Memo. 1995-493, 70 T.C.M. (CCH) 998, acq., 1996-1 C.B. 1.  In that case, NATO posted notice of an expected vacancy on its headquarters staff in Brussels, Belgium. Secretaries of NATO delegations were invited to submit names of qualified candi-

[*13] dates.  The notice stated that the successful candidate would be offered a three-year definite duration contract, renewable by mutual consent for an additional three years.  70 T.C.M. (CCH) at 1001.

The taxpayer, then a program analyst with the U.S. Army, applied for the advertised NATO post.  He was interviewed by NATO personnel at NATO head-quarters in Brussels; NATO paid all expenses relating to this interview.  NATO subsequently informed the U.S. Mission to NATO that it had decided to appoint the taxpayer as a senior statistician.  He accepted this offer, and DoD formally transferred him to his new position with NATO for a three-year term.  This trans-fer was made pursuant to the London Agreement, executed between the United States and the North Atlantic Council in 1951, and 5 U.S.C. sec. 3581(4), govern-ing the transfer of U.S. agency employees to international organizations.  See Adair, 70 T.C.M. (CCH) at 1000-1002.

As a NATO international staff member, the taxpayer in Adair was required to perform services solely for NATO during his term of transfer.  As required by NATO regulations, he took a loyalty oath whereby he swore to perform his duties "with the interests of NATO only in view" and agreed that he would not "seek or accept instructions * * * from any government or from any authority other than * * * [NATO]."  Adair, 70 T.C.M. (CCH) at 1002.  As required by its personnel

**[\*14]** regulations, NATO provided the taxpayer with insurance coverage and educational allowances paid directly by NATO. The taxpayer's job performance "was regularly evaluated by his NATO supervisors." Id. at 1006. NATO had the power to fire the taxpayer for unsatisfactory job performance or in the event of disciplinary action. Id. at 1002-1003.

Taking all these facts into account, we concluded that the taxpayer in Adair was an employee of NATO following his transfer from the Army. In so holding, we relied principally on the fact that he had been formally "transferred" to NATO, pursuant to an international agreement and domestic U.S. law, as opposed to being "detailed," in which case he would have remained "an employee of his agency for all purposes." Adair, 70 T.C.M. (CCH) at 1000, 1005-1006. We also relied on the facts that the taxpayer: (1) had a formal three-year renewable contract with NATO; (2) was required to take a loyalty oath to NATO and refuse to accept instructions from the U.S. Government; (3) could be terminated by NATO for poor job performance; (4) received benefits from NATO as required by its personnel regulations; and (5) was subject to performance evaluations and direction from NATO supervisors regarding his daily activities, the sequence of his tasks, and the means by which the desired results were to be achieved. Id. at 1006.

[*15] We find the instant case to have much in common with <u>Gillis</u> and very little in common with <u>Adair</u>. The taxpayer in <u>Adair</u> applied for a specific position at NATO headquarters and, following an interview and receipt of an offer, was formally transferred by the Army to that NATO position. Petitioner did not apply for a specific NATO position; indeed, he had no idea when he left the United States where he would be stationed or what his mission would be. Unlike the taxpayer in <u>Adair</u>, petitioner did not have a contract with NATO; he was not formally transferred to NATO pursuant to an international agreement or U.S. domestic law; he received no benefits under NATO personnel regulations; he took no oath of loyalty to NATO; and he was subject to regular DoD performance evaluations that are required for all DoD intelligence personnel and were conducted at the Army's direction. <u>Cf.</u> <u>Amaral v. Commissioner</u>, 90 T.C. 802, 809-810 (1988) (distinguishing, for purposes of the London Agreement and a related international treaty, between a U.S. employee who is "seconded" to NATO and a "direct hire" of NATO who is "appointed to the international staff of NATO pursuant to an employment contract").

As we have often noted: "The 'right-to-control' test is the crucial test to determine the nature of a working relationship." <u>Weber v. Commissioner</u>, 103 T.C. 378, 387 (1994) (quoting <u>Matthews</u>, 92 T.C. at 361), <u>aff'd per curiam</u>, 60

**[\*16]** F.3d 1104 (4th Cir. 1995). But "the degree of control necessary to find employee status varies according to the nature of the services provided." Weber, 103 T.C. at 388 (noting that employer "need not stand over the employee and direct [his] every move" in order to exercise the requisite control); see sec. 31.3401(c)-1(b), Employment Tax Regs. ("[I]t is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so."). We conclude here, as we concluded in Gillis, that the Army had the right to control, and actually did control, petitioner's work. The Army had exclusive authority to hire, discipline, and fire petitioner; it paid his salary and provided all his benefits; it directed where he would be deployed and the periods of his service; and it subjected petitioner to the same periodic DCIPS performance evaluations to which all DoD intelligence personnel were subject.[2]

---

[2]Accord, e.g., Eren v. Commissioner, T.C. Memo. 1995-555, 70 T.C.M. (CCH) 1394, 1397, 1398 (holding that State Department contractor was an employee of the United States where agency "had the right to exercise control over petitioner" even though it exercised limited control over his daily activities), aff'd, 180 F.3d 594 (4th Cir. 1999); Marckwardt v. Commissioner, T.C. Memo. 1991-347, 62 T.C.M. (CCH) 262, 266 (holding that USAID contractor was an employee of the United States where agency had the right to control the taxpayer's work even though his work "was not supervised or controlled on a day-to-day basis").

[*17] Petitioner correctly notes that NATO officers supervised his activities on a daily basis, and that the NATO commander, by excluding him from the base, could effectively bring his mission to an end.  But the same was true in Gillis, 52 T.C.M. (CCH) at 1128, where the taxpayer "was assigned to NATO * * * in Germany and worked under the supervision of a German general."  We neverthe-less held that the taxpayer was "controlled * * * by the Air Force" because the Air Force hired him, paid his salary, assigned him to the NATO post, and had exclu-sive authority to discharge him from military service.  Id. at 1129.  We reach the same conclusion here.[3]

---

[3]Our precedents have identified numerous factors that may be relevant in determining whether an employment relationship exists.  See, e.g., Weber, 103 T.C. at 387; Juliard v. Commissioner, T.C. Memo. 1991-230, 61 T.C.M. (CCH) 2683, 2688.  The "right-to-control" factor is the most important, and "[t]he relative importance of each factor * * * is viewed under the facts and circumstances of each case."  Juliard, 61 T.C.M. (CCH) at 2688.  Petitioner urges that several of these factors point to his status as an employee:  he did not offer services to the general public; he provided no capital and had no opportunity for profit and loss; and he did not provide his own tools or workspace.  But these factors are chiefly relevant in determining whether a person is an independent contractor as opposed to an employee; they shed little light on whether petitioner, concededly an em-ployee, was an employee of the Army or of NATO.  The common law factors most relevant to the latter determination are the right to control, the right to discharge, the permanency of the relationship, and the nature of the relationship the parties believed they were creating.  These factors point clearly to the conclusion that petitioner remained an Army employee during his deployment to Afghanistan.  See generally Adair, 70 T.C.M. (CCH) at 1005; Juliard, 61 T.C.M. (CCH) at 2688.

**[*18]** The U.S. involvement in Afghanistan was conducted as part of a coalition. Like other NATO members, the United States participates in NATO-led missions by volunteering troops and civilian personnel. The fact that the United States participates in NATO-led operations by volunteering its personnel indicates that the United States exercises control over those who are thus contributed. Petitioner has not shown that his position upon deployment to Afghanistan differed in any material way from the position occupied by hundreds of thousands of other Army military and civilian employees who have been deployed or seconded to NATO and other allied commands worldwide. In determining whether his wages are excludable under section 911(b)(1)(B)(ii), it is not dispositive that he was "stationed overseas in an allied command" rather than stationed overseas in a U.S. Army base. Gillis, 52 T.C.M. (CCH) at 1129.

Petitioner has not carried his burden of proving that he was an employee of NATO rather than the Army during 2010 and 2011. As an employee of the United States during those years, he is subject to the exception set forth in section 911(b)(1)(B)(ii) and is not entitled to a foreign earned income exclusion.

[*19] To reflect the foregoing,

Decision will be entered for

respondent as to the tax deficiencies and

for petitioner as to the penalties.
